[No. 21072. *En Banc.* April 30, 1929.]

FRANK GLASPEY, *Respondent*, v. WOOL GROWERS SERVICE CORPORATION, *Appellant.*[1]

[1]Reported in 277 Pac. 70.

*H. J. Snively,* for appellant.

*D. V. Morthland,* for respondent.

PARKER, J.—The plaintiff, Glaspey, seeks recovery of damages from the defendant, Wool Growers Service Corporation, upon two causes of action, for alleged damage suffered by him and B. L. Chaney, his assignor, as the result of breach of warranties, in the form of express false representations on the part of the manager of the corporation, inducing him and Chaney to purchase from it 500 ewes and 362 ewes, respectively, for breeding purposes. Trial upon the merits in the superior court for Yakima county, sitting with a jury, resulted in verdict and judgment awarding recovery to Glaspey upon both causes of action, from which the corporation has appealed to this court.

The negotiations leading up to, and the consummation of, these two sales of ewes from the corporation to Glaspey and Chaney occurred at the same time; that is, while they were, in legal effect, consummated as separate sales, the bargaining occurred between the manager of the corporation, Glaspey and Chaney when all were present, and the statements of the manager, claimed by Glaspey and Chaney to amount to express warranty, by way of express false representations as to the quality and condition of the ewes, were made by him simultaneously to both Glaspey and Chaney. The 862 ewes constituted one band, and had been so kept together for a considerable time prior to their sale and delivery by the corporation to Glaspey and Chaney, which occurred August 29, 1924. The alleged warranty and false representations as to their condition and quality were, in substance, that the ewes were, in all respects, fit for breeding purposes and free from disease which would impair their use in that respect, when, in fact, they were diseased with scab and thus

rendered almost wholly unfit for breeding purposes and of little value for any other purpose.

By his first cause of action, Glaspey sought recovery of general damages in the sum of $3,500, measured by the difference between the actual value of the 500 ewes purchased by him and their value for breeding purposes as warranted and represented by the manager of the corporation; and also special damage in the sum of $533.25, measured by the amount of expenditure, in good faith, incurred by him in treating the diseased ewes by dipping, with a view of curing their diseased condition; and also special damage in the sum of $210, the value of six blooded bucks placed with the ewes soon after their delivery and before he was aware of their diseased condition; which bucks became infected and died from the disease. Other items of special damage were claimed, but the above claimed items of the first cause of action, aggregating $4,243.25, were the only ones submitted by the trial court to the jury, upon which there was, by the verdict and judgment, awarded to Glaspey recovery in the sum of $3,167.25.

By his second cause of action, Glaspey, as assignee of Chaney, sought recovery of general damages in the sum of $2,534, measured by the difference between the actual value of the 362 ewes purchased by Chaney and their value as warranted and represented by the manager of the corporation; and also special damage in the sum of $533.25, measured by the amount of expenditure, in good faith, incurred by Chaney in treating the diseased ewes by dipping, with a view of curing their diseased condition; and also special damage in the sum of $2,020, the value of seven blooded bucks and two hundred other sheep placed with the ewes after their delivery and before he was aware of their diseased condition; which bucks and sheep became infected and either died of the disease or were thereby rendered of

little value. Other items of special damage were claimed, but the above claimed items of the second cause of action, aggregating $5,087.25, were the only ones submitted by the trial court to the jury, upon which there was, by the verdict and judgment, awarded to Glaspey recovery in the sum of $3,886.55.

The corporation's manager, who acted for it in making the sales of ewes to Glaspey and Chaney, had charge of the ewes for a considerable time prior to the negotiations and sale, and was well acquainted with the condition of the ewes and well knew the fact that they had then been for some time infected with scab, a highly contagious and damaging disease. At that time, the infection was not such as to be discoverable, except by a person having special knowledge of such disease. Glaspey and Chaney had but little experience in handling or raising sheep, and possessed no experience or learning which would enable them to discover whether or not the sheep were then infected with scab. Glaspey and Chaney negotiated for, and bought, the ewes for the express purpose of breeding. This was well known by the manager of the corporation, who was negotiating for the sale and recommending the ewes to Glaspey and Chaney, particularly for breeding purposes. The ewes were old and were, however, if free from disease, valuable for breeding purposes, but of little value for any other purposes. The manager of the corporation was fully advised as to the inexperience of Glaspey and Chaney as sheepmen, and as to their special purpose in the acquiring of the ewes.

During the summer of 1924, the manager of the corporation had learned from Glaspey that he desired to acquire several hundred ewes for breeding purposes. This was learned in a conversation had between them, in which, however, no negotiations were

had looking to a sale of ewes from the corporation to Glaspey or Chaney. As to what negotiations and conversation occurred thereafter between Sears, the manager of the corporation, and Glaspey and Chaney, looking to, and in, the consummation of the sales in question, Glaspey testified as follows:

"Q. What conversation did you have with Mr. Sears after that time during the summer of 1924 relative to buying sheep? A. In August a letter came to the ranch from the Wool Growers Service Corporation advising me that they had a band of sheep at Ellensburg that were what I wanted and would I come in as soon as I could, which I did. It was about the middle of August, probably the 15th. Q. Did you go to Ellensburg with Mr. Sears? A. No, I didn't; I came down on the street [in Yakima] and ran into Mr. Chaney and told him I was going to Ellensburg to look at the sheep and asked if he wanted to go along. He said he would, so we went up and met Mr. Sears in Ellensburg. Q. Relate what you did. A. We got Mr. Sears' car and went to where the sheep were. They were in the brush around there and we looked them over and I caught a few of them and looked at their mouths. Sears said, 'Boys, there is no use looking at their mouths, they are broken mouthed ewes, but otherwise they were good breeding ewes and will bring in ten pounds of wool and 120 per cent lambs if they are well taken care of. You can figure on that;' that they were absolutely all right in everything except as to age. Q. About how old were those ewes? A. The majority of them were broken mouthed ewes; they were anywhere from five up to seven. Q. What do you mean by broken mouthed ewes? A. I mean a ewe that has lost some of her teeth. Q. Did you buy some of these sheep? A. I did; I bought five hundred. Q. Did Mr. Chaney buy some. A. He did, when we went back to Ellensburg."

Chaney's testimony corroborates this testimony of Glaspey, showing that the statements made by Sears, the manager of the corporation, as to the condition and quality of the ewes, were intended by him to be

addressed to Chaney as well as to Glaspey. In other words, these statements were as much a part of the negotiations between Sears and Chaney as between Sears and Glaspey, following which Chaney then bought 362 of the ewes at the same time Glaspey bought 500 of the ewes. We deem it unnecessary to here further quote or state the substance of Chaney's testimony. Both Glaspey and Chaney relied upon the statements made by Sears as to the quality and condition of the ewes, and manifestly made their respective purchases wholly ignorant of the ewes being infected with scab.

On August 29, 1924, the 862 ewes were delivered by the corporation to Glaspey and Chaney. They kept the ewes together for a considerable time at Glaspey's ranch, where Chaney, soon after the purchase, put in with them 155 young ewes which he already owned. These were free from scab infection. Glaspey and Chaney then put into the band the bucks which they had acquired elsewhere, and which were free from scab infection. Early in October, 1924, the scab made its appearance in the band so as to become observable, and on October 4, 1924, the whole band was quarantined by the public authorities. The whole band was then treated by dipping, under the supervision of a state veterinarian inspector, at the expense of Glaspey and Chaney. Later, Chaney, assuming that the band had been cured of the scab, put into it 45 other sheep, which were then free from scab infection. In August, 1925, the scab broke out again in the band, and in September they were again treated by dipping, under official supervision. The original band became so afflicted that great damage resulted from loss in their value, particularly loss in their value for breeding purposes.

The additional bucks and sheep placed in the band

became infected with scab, and were thereby also greatly damaged and depreciated in value, many of them dying of the disease. Glaspey and Chaney were also greatly damaged in the incurring of necessary expense incurred by them in good faith, looking to the curing of the disease and the lessening of the damage being suffered thereby. All this expense looking to the cure of the disease and thereby lessening the damage being suffered by Glaspey and Chaney, the jury might well conclude was fully warranted under the circumstances. The evidence is not free from conflict, particularly as to the statement of Sears, the corporation's manager, as to the condition and quality of the 862 ewes at the time they were sold to Glaspey and Chaney; but we think the jury were fully warranted by the evidence in finding the facts, as they evidently did, to be substantially as above summarized.

On July 27, 1926, this action was commenced. Upon the trial, the jury not only returned a general verdict awarding recovery as above noticed, but also answered a special interrogatory, we think as the evidence warranted, as follows:

"Interrogatory No. 1: If you find that there was an infection of these sheep with the scabies in September, 1925, was it a carry-over of the infection, if you believe there was one, of October, 1924, or was it a reinfection?

"Answer: Carry-over."

■ The principal contention here made in behalf of appellant corporation is, in substance, that the trial court should have decided, as a matter of law, that the evidence was not sufficient to support any recovery upon the theory of express warranty and breach thereof on the part of the corporation. We shall not make critical inquiry or seek to draw any fine distinctions between liability arising from breach of warranty, ex-

press or implied, and liability arising from false representations, viewed as fraudulent, inducing one to enter into a contract of purchase to his damage. In Williston on Sales, at § 197, that learned author observes:

"Much of the intrinsic difficulty and still more of the divergence of authority which characterize the law of warranty are due to an imperfect recognition of the nature of the obligation imposed by a warranty. As has been seen, the action upon a warranty was in its origin a pure action of tort. There is no doubt that to-day the *obligation of a warrantor is generally conceived of as contractual*, and there can be no doubt also that a seller may expressly promise to be answerable for some alleged quality of the articles sold, or that if he makes such a promise for good consideration he enters into a contract. This, however, does not either upon authority or reason exhaust the possibilities of express warranties. It should not be the law, and by the weight of modern authority, it is not the law that a seller who by positive affirmation induces a buyer to enter into a bargain can escape from liability by denying that his affirmation was an offer to contract. A positive representation of fact is enough to render him liable. The distinction between warranty and representation which is important in some branches of the law is not appropriate here. The representation of fact which induces a bargain is a warranty."

It seems to us that the trial court did not err in refusing to decide, as a matter of law, that there was no express warranty by the corporation that the 862 ewes were free from the very damaging and contagious disease of scab. True, its manager did not use the word "scab" when he said, "The ewes are absolutely all right in everything except as to age," as testified by Glaspey and Chaney; but surely this, with other language used by the manager at the time of the negotiations and sale, amounts to a positive representation by him that the ewes were then free from such a

dangerous and contagious disease as scab. In § 12, chapter 142, Laws of 1925, Ex. Ses., p. 360 (Rem. 1927 Sup., § 5836-12), our uniform sales act, we read:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon."

True, this act was passed by our legislature after the making of the representations and the consummation of the sale here in question. We regard this language however as but a statutory expression of what is conceived by the weight of authority to be the real nature of an express warranty. The following of our decisions are in harmony with this view, though some of them may be considered as in terms resting right of recovery upon implied warranty and false representations viewed as fraudulent, rather than upon express warranty. *Huntington v. Lombard,* 22 Wash. 202, 60 Pac. 414; *Puget Sound Iron & Steel Works v. Clemmons,* 32 Wash. 36, 72 Pac. 465; *Northwestern Lumber Co. v. Callendar,* 36 Wash. 492, 79 Pac. 30; *Mullerleile v. Brandt,* 64 Wash. 280, 116 Pac. 868; *Kelly v. Lum,* 75 Wash. 135, 134 Pac. 819, 49 L. R. A. (N. S.) 1151; *Hausken v. Hodson-Feenaughty Co.,* 109 Wash. 606, 187 Pac. 319.

We conclude that there was no error prejudicial to the corporation in the case being presented to the jury upon the theory of express warranty that the 862 ewes were free from scab infection, and leaving the jury to decide as to whether or not there was such a warranty, and as to the damage, if any, resulting therefrom to Glaspey and Chaney.

Contention is made in behalf of the corporation that the trial court should have withdrawn from the jury the question of allowing for any expenditure

incurred by Glaspey and Chaney in treating the diseased sheep by dipping, with a view of curing their disease. The question of whether or not Glaspey and Chaney should be compensated for expenditures made by them looking to the curing of the disease and thus lessening their damage, it seems clear to us, was a question for the jury to decide. The evidence was plainly sufficient to warrant the jury in concluding that Glaspey and Chaney were entitled to recovery for at least a large part of their expenditures made in that behalf. Of course, they would not be entitled to recover for any unnecessary expenditures in that behalf, but they were entitled to recover for what, under the circumstances, was reasonably expended by them looking to the lessening of their damage for the breach of the warranty. *Long v. Clapp,* 15 Neb. 417, 19 N. W. 467; *Ellis v. Hilton,* 78 Mich. 150, 43 N. W. 1048, 18 Am. St. 438, 6 L. R. A. 454; 17 C. J. 806; 8 R. C. L. 450.

 Contention is made in behalf of the corporation that the trial court erred in submitting to the jury any claim of damage resulting from the scab-infected 862 ewes communicating the disease to the additional sheep put into the band by Glaspey and Chaney after the purchase. If Glaspey or Chaney had put the additional sheep into the band, knowing at the time the band was infected and would likely communicate the disease to them, Glaspey and Chaney would not be entitled to complain. But we think the evidence was such that it was a question for the jury to decide whether or not Glaspey and Chaney were free from fault in putting into the band the additional sheep at the time they did so, and as to whether or not the disease was so communicated to the additional sheep, to their damage. *Marsh v. Webber,* 16 Minn. 418; *Knox v. Wible,* 73 Ind. 233; *Joy v. Bitzer,* 77 Iowa 73, 41

N. W. 575; *Barton v. Dowis,* 315 Mo. 226, 285 S. W. 988, 51 A. L. R. 494, and note at page 502.

Other claims of error are made in behalf of the corporation, the more important of which are, in effect, sufficiently disposed of by what we have already said. The others we have examined and think are not of sufficient merit to call for further discussion.

The judgment is affirmed.

FULLERTON, MAIN, BEALS, MILLARD, and FRENCH, JJ., concur.

HOLCOMB, J. (dissenting)—If, assuming that such is shown by the facts in the record, there was substantial evidence of knowledge on the part of appellants of the previous diseased condition of the sheep sold and infected with a contagious disease, then there was imposed on the seller the especial duty to disclose such fact, even though there is no such duty to disclose ordinary latent defects (24 R. C. L. 348, § 736). Possibly there was a question for the jury on the facts on that feature.

But, conceding that there was sufficient evidence to take that question to the jury, the remedy of the buyer in damages in such case, where the property is kept, is the difference between the value of the property as it actually was and what it would have been if it were as it was represented to be. This universal rule applies to all branches of warranty as to condition or quality of goods and chattels sold upon warranty; to which may be added such special damages as are the natural consequence and proximate result of the seller's fraud (24 R. C. L. 354-355). These principles have always been followed by this court respecting all breaches of warranty as to condition or quality.

It seems to me that these rules were violated by the trial court, both in the admission and exclusion of cer-

694

tain items of evidence and in giving and refusing instructions to the jury.

These several items resulted in large recoveries thereon and are not discussed in the opinion. On account of such manifest errors, a reversal and new trial should be ordered.

Upon these matters I feel obliged to dissent from the majority.

TOLMAN, J., concurs with HOLCOMB, J.

[1]Reported in 277 Pac. 83.