[No. 30725. Department Two. August 17, 1949.]

CRYSTAL RECREATION, INC., *Respondent*, v. SEATTLE ASSOCIATION OF CREDIT MEN, *as Assignee for the Benefit of Creditors of Modern Store and Restaurant Equipment Corp., Appellant.*[1]

[1] Reported in 209 P. (2d) 358.

*Jones & Bronson* and *Wheeler Grey,* for appellant.

*Clarke, Stone & Hoover* and *Robbins & Robbins,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment in a replevin action rendered in favor of the plaintiff.

We shall refer to Crystal Recreation, Inc., as "Crystal"; to Modern Store and Restaurant Equipment Corporation, as "Modern"; and to Seattle Association of Credit Men, as "Association."

In October, 1946, Crystal had a location in the basement of a building at 423 Pike, in Seattle. It intended to establish there a general restaurant business, cigar store, card room, and tavern. It employed an architect to prepare plans for fixtures, which had to be specially made because of the shape of the room. There was a call for bids, and on November 27, 1946, it entered into a written contract with Modern for the construction of the fixtures at an agreed price of $21,878. It agreed to make payments on or about the 5th day of each month of 85% of the value of labor and materials incorporated in the work, as estimated by the architect. Article 21 provided:

"Art. 21. The Owner's Right to Do Work.—If the Contractor should neglect to prosecute the work properly or fail to perform any provision of this contract, the Owner, after three days' written notice to the Contractor may, without prejudice to any other remedy he may have, make good such deficiencies and may deduct the cost thereof from the payment then or thereafter due the Contractor, provided, however, that the Architect shall approve both such action and the amount charged to the Contractor."

Article 22 provided:

"Art. 22. Owner's Right to Terminate Contract. If the Contractor should be adjudged a bankrupt, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed on account of his insolvency, . . . then the Owner, upon the certificate of the Architect that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy and after giving the Contractor seven days' written notice, terminate the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the work by whatever method he may deem expedient."

Article 33 provided:

"Art. 33. Assignment.—Neither party to the Contract shall assign the Contract or sublet it as a whole without the written consent of the other, nor shall the Contractor assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner."

The work was being done at Modern's plant at 1616 Eighth avenue, Seattle. The following payments were made on the contract:

| | |
|---|---|
| December 18, 1946 | $2,084.22 |
| January 10, 1947 | 9,703.04 |
| February 10, 1947 | 5,240.25 |
| | $17,027.51 |

Prior to the payment of February 10th, Modern executed to Crystal a bill of sale dated February 10, 1947, in consideration of the sum of $21,233, covering the following described personal property located at 1616 Eighth avenue, Seattle: "all fixtures shown on blue prints by Waldo B. Christenson for Crystal, Inc., dated October 18, 1946, and described in specifications as work included in fixture contract."

The certificate of the architect for the Feb. 10th payment showed:

| | | | |
|---|---|---|---|
| "Amount of Contract | | | $21,878.00 |
| Eliminate Booth Table Tops | | $645.00 | |
| Net Amount this Date | | | 21,233.00 |
| Total Work Done This Period | $6,165.00 | | |
| Less 15% Retained | 924.75 | | |
| Amount Due This Certificate | | 5,240.25 | |
| Amount Previously Certified | | 11,787.26 | |
| Total Certified to Date | | | 17,027.51 |
| BALANCE | | | $4,205.49 |

"Remarks: A bill of sale to Crystal, Inc. in the full amount of the contract price has been issued by the Contractor as a condition precedent to payment of the amount herein certified."

The bill of sale was never recorded. Prior to March 12th, four lunch counters and the oval bar had been delivered to Crystal. The balance of the fixtures remained at the Mod-

ern plant. None of the fixtures, whether delivered or not, was completed.

On March 12, 1947, Modern executed to the Association a common-law assignment for the benefit of creditors. It stated:

"Assignor does assign, transfer, and deliver unto said assignee, all that certain stock of goods, wares and merchandise, consisting principally of stock and restaurant equipment, and now located at 1616 Eighth Avenue, Seattle."

For at least four months prior to the assignment, Modern had been insolvent. Immediately upon the giving of the assignment, John B. Morris, an employee of the Association, took possession of the property, placed a padlock on the door, and prepared to take inventory. Mr. Replogle, manager of Modern, told Morris that the fixtures involved in this action were being constructed for Crystal, and belonged to Crystal. Crystal called on the telephone and demanded the property, which was refused.

Before an inventory could be taken, this action was commenced, a bond furnished, and the fixtures removed to Crystal's place of business. It cost Crystal approximately ten thousand dollars to complete and install the fixtures.

The trial court found that plaintiff entered into a written contract with Modern whereby the latter agreed to construct and install fixtures and equipment for a restaurant to be operated by plaintiff; that the fixtures were to be specially constructed, according to plans and specifications, and were to be designed and adapted to the particular location according to its measurements and contour; that Modern did not carry the fixtures upon any of its books of account as an asset; that it considered and regarded said fixtures as belonging to and being owned by plaintiff at the time of making the common-law assignment, and so advised the common-law assignee; that the fixtures, when replevied by plaintiff on March 14th, and when conveyed to plaintiff by bill of sale, had been appropriated to the original contract; that the Association acquired no title or interest in the fixtures by virtue of the common-law assignment; that

plaintiff, on the date of the assignment and on the date of the replevin, owned all of the fixtures and was entitled to the possession thereof.

The plaintiff in a replevin action must prove its title and right to possession in order to be successful in the action. The plaintiff can only succeed on the strength of its own title and right to possession, irrespective of the title or right to possession of the defendant. *Colby v. Nelson,* 131 Wash. 650, 230 Pac. 629.

Thus, at the threshold of this case, we are faced squarely with the issue: Where was the title to the goods in question at the time of the assignment for the benefit of creditors? In order to resolve this question, we must first determine whether the agreement was a contract for the *sale* of goods to be manufactured or a contract for the *manufacture* of goods. If it be held the former, then the various provisions of the uniform sales act will apply in construing this contract. If it be held the latter, then it is in the nature of the common-law contract for work, labor, and materials, and the uniform sales act will not be applicable. In such a case, we must interpret the agreement according to the general principles of the law of contracts.

The common law recognized the distinction between contracts to sell and contracts for work, labor, and materials. Some of the courts and text writers are of the opinion that § 5 of the uniform sales act (Rem. Rev. Stat., § 5836-5 [P.P.C. § 854-9]), which gives legal effect to contracts for "future goods" as contracts to sell, eliminates that distinction. The case authority on either side of this proposition is scant and divided. See Annotation, 111 A. L. R. 341. However, we believe it to be the better rule that the act does not purport to include within its purview contracts for work, labor, and materials. In a sound, analytical opinion, the Utah court sets forth the reasons for this rule in the case of *Sidney Stevens Implement Co. v. Hintze,* 92 Utah 264, 67 P. (2d) 632, 111 A. L. R. 331, wherein a contract to construct a trailer especially for a traveling salesman, which was not readily salable to others in the manufacturer's

regular course of business, was held to be a contract for work, labor, and materials, and not a contract to sell. In construing §§ 5 (*supra*) and 76 (defining future goods) of the act, the court said:

"If, as a matter of law, a contract is one for work, labor, and materials, it is not a contract of sale and consequently would not come within the definitions contained in sections 5 and 76. These two sections, therefore, do not contain any new rule expanding the law of sales to include within its purview a transaction which is not a 'contract to sell,' nor does the act contain any definition of a 'contract to sell' which enlarges its scope so as to eliminate the distinction, existing before the creation of the Uniform Sales Act, between a contract of sale and a contract for work, labor, and materials. We fail to see, therefore, how sections 5 and 76 of the Sales Act can apply to a contract involving, not a 'contract to sell,' but a contract involving the manufacture of something especially for the buyer and not readily saleable to others in the manufacturer's regular course of business, if such a contract cannot be said to be a contract to sell when made, but must be considered a contract for work, labor, and materials."

As the reasoning of the Utah court indicates, there must be a "sale" or a "contract to sell" before the act will apply to a given transaction. It is not the purpose of the uniform sales act to bring within its scope every transaction involving a change in possession or ownership of chattels. The act itself, in § 73, recognizes that there are cases which are not provided for in the act and stipulates that such cases shall be governed by the general principles of law and equity. Sound reasoning supports the rule that a contract for work, labor, and materials is just such a case and is therefore not within the confines of the act.

Turning now to the consideration of the nature of the contract in the present case, we note first that it is composed of two principal parts. The first is a printed form entitled "The Standard Form of Agreement Between Contractor and Owner for Construction of Buildings"; it seems to be the custom in the building trades to use this form whether the contract involves construction, remodeling, or "fixture

work," the latter being the term used in this contract. The second part embodies detailed specifications for the various items to be built and installed. Throughout the agreement we find that Crystal was dealing with Modern as a contractor, not as a seller. The parties are referred to as "Contractor" and "Owner." Nowhere in the instrument do we find the words "buyer" or "seller," "vendor" or "vendee." Modern submitted the following statement on February 3, 1947:

"Labor ............................... $7,009.22
Material ............................  5,950.02

                                      12,959.24
Overhead ...........................  3,530.05

                                      16,489.29
Profit .............................  3,543.06

                                      20,032.35
Less 15% ...........................  3,004.84

                                      17,027.51
Less Payments Made................. 11,787.26

Amount Due .....................            $5,240.25"

The very form of this and other statements periodically rendered, the unambiguous wording of the written instrument evidencing the agreement, and the actions of Crystal and Modern in entering into and performing this contract, convince us that the parties thereto intended to, and did in fact, enter a contract for work, labor, and materials and not a contract for the sale of "future goods." This conclusion is given added support when we note that the fixtures were required to fit a particular floor plan in Crystal's building; that most of them would be of little value elsewhere, and hence, Modern could have found no ready market for them had Crystal refused to accept them.

Since the language of the contract is unambiguous, and since that language clearly indicates that the parties entered into a contract for work, labor, and materials, the courts cannot, under the guise of interpretation, and in the absence of fraud, deceit, or mistake, rewrite or reform that

contract as a contract to sell. See *Peabody v. Star Sand Co.,* 186 Wash. 91, 56 P. (2d) 1018; *Bellingham Securities Syndicate v. Bellingham Coal Mines,* 13 Wn. (2d) 370, 125 P. (2d) 668; *Chaffee v. Chaffee,* 19 Wn. (2d) 607, 145 P. (2d) 244. See, also, 12 Am. Jur. 749, Contracts, § 228.

We are not unmindful of the case of *Prescott Co. v. Franklin Tool Works,* 117 Wash. 283, 201 Pac. 308, cited by appellant, wherein the contract provided that the defendant agreed "to build, assemble, test and deliver on board the cars, . . . two . . . heavy oil burning engines . . ."

In its opinion, this court considered that as a contract for the sale of chattels; the goods there were to be manufactured for sale. As a matter of fact, as the court points out, the vendee was in the business of having engines manufactured for sale. But, in the present case, the contract was clearly for work, labor, and materials.

Having determined the nature of the contract, we now pass to a consideration of the question of title to the fixtures. Section 12 of the contract provided that the contractor shall protect the owner's property from injury or loss arising in connection with the contract. Section 21 gives the owner the right to complete the work in the event of the neglect or default of the contractor. However, the contract is silent as to precisely when title shall pass. We must, therefore, look to the intent of the parties on this issue.

■ "Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." 12 Am. Jur. 745, Contracts, § 227.

"The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only the acts but the declarations of the parties may be considered." 3 Williston on Contracts 1792 (Rev. ed.) § 623.

This court, in the case of *In re Garrity's Estate,* 22 Wn. (2d) 391, 156 P. (2d) 217, set forth the rule:

"In ascertaining the intention of parties to a written agreement, we must look to the wording of the instrument itself as made by the parties, view it as a whole, and consider all of the circumstances surrounding the transaction, including the subject matter together with the subsequent acts of the parties to the instrument."

■   There is no question but that, in the instant case, the parties considered that title should, and did, pass upon the payments as they were made, regardless of whether or not the fixtures at the time of each payment were completed. The subsequent acts and declarations of the parties during the course of performance clearly indicate that such was their intent. The case was tried to the court. It found, upon conflicting testimony, that title passed. We are unable to say that the evidence clearly preponderates against such finding.

■   Appellant calls our attention to Rem. Rev. Stat., § 5827 [P.P.C. § 577-7], as follows:

"No bill of sale for the transfer of personal property shall be valid, as against existing creditors or innocent purchasers, where the property is left in the possession of the vendor, unless the said bill of sale be recorded in the auditor's office of the county in which the property is situated, within ten days after such sale shall be made."

The bill of sale, dated February 10, 1947, was never recorded. Appellant contends that, when Modern executed the assignment on March 12th, it, appellant, became an existing creditor and had preferential rights superior to those of respondent. That would be true if the bill of sale were given for the purpose of passing title. But the trial court found, as does this court, that title passed when the payments were made, and that the bill of sale was given merely as evidence of title which had already passed.

The judgment is affirmed.

SIMPSON, C. J., ROBINSON, JEFFERS, and GRADY, JJ., concur.