[No. 15588–4–I.   Division One.   December 24, 1986.]

ARANGO CONSTRUCTION COMPANY, *Appellant,* v. SUCCESS ROOFING, INC., ET AL, *Respondents.*

*Anne–Marie Weller, Dale R. Ulin, Richard L. Lambe,* and *Ulin, Dann, Elston & Lambe,* for appellant.

*Zanetta L. Fontes, Lawrence J. Warren,* and *Warren & Kellogg,* for respondents.

COLEMAN, J.—Arango Construction Co., a general contractor, appeals a denial of its motion for reconsideration after the trial court granted summary judgment to Success Roofing, Inc., the defendant subcontractor, in a claim for breach of contract. We reverse and remand for entry of judgment in favor of Arango Construction Co.

On December 6, 1983, Success Roofing, Inc., submitted a telephone bid to Arango Construction Co. to install a "built–up" roof on additions to the tactical equipment shops at Fort Lewis, Washington. The bid had been prepared by Estimates, Inc., in the employ of Success. The bid included work in only two sections of the project (7A and 7B) and amounted to $34,659. On December 6, Arango

included the Success bid in its prime bid to the United States Army Corps of Engineers for the Fort Lewis project. The Army Corps of Engineers postponed the bid opening until December 21, 1983. On December 8, 1983, Arango informed Success of this delay and asked that their bid be confirmed as accurate and current. Success confirmed the bid made for sections 7A and 7B at $34,659.

Arango had received another bid for sections 7A and 7B of $38,500 from Tin Benders, but that bid was expressly contingent on the award to that subcontractor of sections 7C, 7E, and 7F as well. Arango chose to use the Success bid for 7A and 7B with a bid for work on 7C, 7E, and 7F from Cleo Roofing because these combined subcontracting bids made Arango's bid the lowest price for the roofing work. Thus Arango resubmitted its prime bid and the bids were opened on December 21, 1983.

On January 12, 1984, the Corps of Engineers awarded the Fort Lewis contract to Arango. Arango notified Success on January 30, 1984, by sending its standard subcontract form for signature. On February 6, 1984, Cleo Roofing's subcontract was fully executed. Upon receipt of Arango's contract, Success requested and received a set of prints and specifications for the project. In reviewing the plans and the bid that had been developed for Success by Estimates, Inc., Success discovered an error in the contract bid amount. The bid suggested by Estimates, Inc., for Success was 50 percent less than it should have been because Estimates, Inc., had failed to note that the drawings and specifications they used to compute the bid were reduced 50 percent. It is undisputed that this error was made by Estimates, Inc. After confirming the mistake with Estimates, Inc., Success phoned Arango on February 13, 1984, informed Arango of the error, and stated that they would not perform at the original bid price. On February 16, 1984, Success wrote Arango, withdrawing its original bid and explaining its error. On May 7, 1984, because Success refused to perform, Arango awarded the contract for sections 7A and 7B to Cleo Roofing (the contractor that was already committed to

do the work on sections 7C, 7E, and 7F). The price at which Cleo agreed to perform the work on the two sections was $54,733.

On April 30, 1984, Arango filed this action for breach of contract against Success. On November 5, 1984, Arango filed a motion for summary judgment based on the doctrine of promissory estoppel. Success then moved to add Estimates, Inc., as a third party defendant in the action and filed a cross motion for summary judgment based on application of the Uniform Commercial Code, RCW 62A.2–201. The trial court held that the statute of frauds provision (RCW 62A.2–201) applied, rendering the oral bid unenforceable. Arango's complaint was dismissed with prejudice. Following denial of Arango's motion for reconsideration, this appeal was timely filed.

We first determine whether the provisions of RCW 62A.2–201 apply in this case.

Arango contends that since this is not a contract for goods, it is not subject to the provisions of article 2 of the U.C.C. The scope of article 2 is described in RCW 62A.2–102.

> Unless the context otherwise requires, this Article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this Article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers.

RCW 62A.2–102.

The comments to RCW 62A.2–102 indicate that construction contracts are not within the scope of this statute: "This section rephrases the coverage stated in USA [Uniform Sales Act] 75 (RCW 63.04.750), implicitly continuing exclusion of construction, service and real property transactions." Washington Comments, RCWA 62A.2–102, at 95.

In interpreting this statute, Washington courts have held in accordance with the comment. In *Crystal Rec., Inc. v. Seattle Ass'n of Credit Men,* 34 Wn.2d 553, 209 P.2d 358

(1949), the court stated that the Uniform Sales Act (precursor of RCW 62A.2) did not apply to a contract for work, labor, and materials.

> [W]e must first determine whether the agreement was a contract for the *sale* of goods to be manufactured or a contract for the *manufacture* of goods. If it be held the former, then the various provisions of the uniform sales act will apply in construing this contract. If it be held the latter, then it is in the nature of the common–law contract for work, labor, and materials, and the uniform sales act will not be applicable. In such a case, we must interpret the agreement according to the general principles of the law of contracts.

*Crystal,* at 558.

The principle that contracts for work, labor, and materials are governed by common law principles of contract, while contracts for goods are governed by the Uniform Sales Act, was again stated in *Whatcom Builders Supply Co. v. H.D. Fowler, Inc.,* 1 Wn. App. 665, 463 P.2d 232 (1969). There, Whatcom Builders had a construction contract with the City of Blaine to construct a sewage treatment plant. Whatcom also had a subcontract with Fowler to supply a pump for the plant. *Whatcom,* at 666. The court held that the Whatcom/Fowler contract was a contract for the sale of goods to be manufactured; therefore, that contract was within the scope of the Uniform Sales Act. The Whatcom/Blaine contract, however, was a contract for work, labor, and materials. Therefore, the general principles of contract law, not the Uniform Sales Act, applied to that contract. *Whatcom,* at 668.

In a dispute regarding damages for delay in completion of buildings at Washington State University, our Supreme Court held that construction contracts are not governed by RCW 62A.2. *Christiansen Bros. v. State,* 90 Wn.2d 872, 586 P.2d 840 (1978). Further, the court found no evidence of any legislative intent to apply RCW 62A.2 to construction contracts. *Christiansen,* at 877.

Success attempts to distinguish *Crystal* because the agreement in dispute there was written; therefore it was not

subject to nullification under the article 2 statute of frauds. The threshold question, however, of whether article 2 (RCW 62A.2) applies, must be answered before the statute of frauds issue is relevant. Since the rule in Washington is that bids for construction or construction contracts are not governed by article 2 of the U.C.C. (RCW 62A.2), the statute of frauds in that section is not applicable.

Success further argues that the holding in *Christiansen* does not encompass contracts for labor and materials where materials are a substantial portion of the contract. Success argues that the contract in this case involves predominantly materials and only incidentally labor and work. Our cases, however, do not distinguish contracts for work, labor, and materials in which the materials were a substantial part of the contract. Further, the record in this case does not indicate that the materials involved in this contract were a substantial portion of the contract. The record merely states that in this $34,659 contract, the cost of the materials would be greater than $500.

Success cites two cases for the proposition that RCW 62A.2 applies to the contract in this case. In *Lige Dickson Co. v. Union Oil Co.*, 96 Wn.2d 291, 300, 635 P.2d 103 (1981), our Supreme Court held that the doctrine of promissory estoppel could not be used to render enforceable a contract that violates RCW 62A.2–201. The contract in dispute, however, was for the supply of liquid asphalt. *Lige Dickson,* at 292. No work or labor was involved in that contract; therefore, RCW 62A.2 applied.

Success also cites *Lakeside Pump & Equip., Inc. v. Austin Constr. Co.*, 89 Wn.2d 839, 576 P.2d 392 (1978), for the proposition that RCW 62A.2 applies to contracts in which a subcontractor supplies materials to a general contractor. The contract at issue was an oral bid for supplying two pump stations to a general contractor. *Lakeside,* at 841. The general contractor had changed the engineering specifications for the pumps after Lakeside had submitted a bid. Thus, Lakeside refused to sign a contract agreeing to meet the new specifications at the original bid price. *Lakeside,* at

842. The *Lakeside* court held that no contract had been formulated because there was never a meeting of the minds. Even though this was a transaction in goods to which RCW 62A.2 applied, the common law principle that contract formation requires a meeting of the minds was not precluded by the statute. *Lakeside,* at 845. The *Lakeside* and *Lige Dickson* contracts were governed by the Uniform Commercial Code because they were contracts for materials only; work and labor were not involved. The Success contract is not a contract for materials only; it is a construction contract for work, labor, and materials. Therefore, RCW 62A.2 does not apply, and RCW 62A.2–201 does not govern in this case.

Success further contends that there was no meeting of the minds on the terms of the contract, so there was no contract. Success states that the terms of the standard form contract it received from Arango had not been discussed and were not agreed upon. Success's examples of terms in dispute are of sections that require submission of disputes to arbitration, that include an attorney's fees clause, and that waive contractor responsibility for the conduct of its officers or agents prior to execution of the contract. The only issue presented by this case, however, is the enforceability of the oral bid. The letter of withdrawal sent by Success to Arango on February 16, 1984 states that the only term in dispute was the price, due to an error in computing the bid. The evidence indicates that the oral bid was given; Success and Arango believed it to be correct; Arango used that bid in its prime bid; Arango then accepted the bid when it was granted the contract and sent Success a standard form contract including that bid amount. Upon receipt of the contract form, Success determined that the bid amount was 50 percent less than it should have been. Success then withdrew its original bid and did not make an offer or contest the contract terms. Success's argument that contract terms were in dispute is without merit.

Success also alleges that the failure of a condition precedent rendered the bid unenforceable. Success argues that

its bid to Arango was conditioned upon a written confirmation. Since its bid was never confirmed in writing, there was no contract. Further, it posits that oral subcontractor bids are traditionally so conditioned. Success then cites *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539–40, 424 P.2d 290 (1967), for the proposition that a conditioned contract is unenforceable until that condition is met.

■ The *Corbit* case, however, did not involve a construction bid, but a contract for the execution of a deed conditioned upon payment. In contract law, construction bidding is treated as a unique category. Since construction bidding deadlines make the drafting of written agreements impossible, contractors must rely on oral bids. Therefore, the courts consider the subcontractor's oral bid an irrevocable offer until the general contractor has been awarded the prime contract; then the courts apply promissory estoppel to ensure that the subcontractor does not raise the bid. This concept was explained in Feinman, *Promissory Estoppel and Judicial Method,* 97 Harv. L. Rev. 678 (1984).

> A recurrent example of the flexible approach to promise is found in the courts' treatment of construction bidding cases, which have repeatedly generated important promissory estoppel decisions. In the typical case, a general contractor preparing to bid on a construction project receives bids on parts of the job from subcontractors and suppliers. The general then prepares its own bid on the basis of the lowest reliable subcontract bids. Subcontractors occasionally miscalculate, in part because they often compute their bids and telephone them to the general only hours before the general's bid is due. A subcontractor may also intentionally submit a low bid in the hope of receiving the contract and renegotiating the price. Conflict typically arises when, after the general has calculated and submitted its own bid and won the contract, a subcontractor notifies the general that the subcontractor has made an error or an intentionally low bid and refuses to perform.

> Under traditional contract analysis, the subcontractor could withdraw with impunity, because its bid was regarded as an offer, revocable until accepted, to enter

into a bilateral contract. In the leading case of *Drennan v. Star Paving Co.,* [51 Cal. 2d 409, 333 P.2d 757 (1958),] however, Justice Traynor held that the business context of the bid required that promissory estoppel apply to make the subcontractor's offer irrevocable until the general contractor had an opportunity to accept after being awarded the prime contract. The general's acceptance of the subcontractor's bid then created a traditional bilateral contract, for breach of which the subcontractor was required to pay as damages the difference between its bid and the higher price the general had to pay another subcontractor to perform the work. Cases since *Drennan* have held that promissory estoppel normally binds a subcontractor to the terms of its bid. Although the subcontractor does not make an explicit promise to keep its bid open, the court infers such a promise.

(Footnotes omitted.) Feinman, at 692–94. *See also* Restatement (Second) of Contracts § 87(2), comment *e* (1979).

This court has accepted the *Drennan* rationale in *Ferrer v. Taft Structurals, Inc.,* 21 Wn. App. 832, 587 P.2d 177 (1978).

This concept [promissory estoppel] applies readily to the unique situation of a subcontractor and a general contractor, as exists here. A subcontractor submits a bid to the general contractor, knowing the general cannot accept the bid as an offer immediately, but must first incorporate it into the general's offer to the prospective employer. The general contractor incorporates the bid in reliance upon the subcontractor to perform as promised, should the prospective employer accept the general's offer. Thus, the elements of predictable and justifiable reliance and change of position are satisfied. Numerous courts and authorities have opined that a subcontractor's bid upon which a general contractor relies should be deemed irrevocable for a reasonable time pursuant to the doctrine of promissory estoppel. *Drennan v. Star Paving Co.,* 51 Cal. 2d 409, 333 P.2d 757 (1958).

Thus, had Taft refused to perform following the award of the contract to Halvorson, a breach of contract action

based on Taft's original bid would have been appropriate.

(Citations omitted.) *Ferrer*, at 835.

Thus, as a matter of law, a subcontractor's bid is considered an irrevocable offer until the award of the prime contract; then, the general contractor's acceptance of the bid results in a bilateral contract. Further, there is nothing in the record to indicate that Success imposed the condition of a written confirmation on its quote. In short, the record does not support a conclusion that there was a failure to formulate an enforceable contract.

Finally, we consider Arango's contention that its motion for summary judgment should have been granted.

Arango's motion for summary judgment is based on the *Ferrer/Drennan* rationale that once a general contractor has incorporated a subcontractor's bid, he has justifiably relied and changed position. *Drennan v. Star Paving Co.*, 51 Cal. 2d 409, 333 P.2d 757 (1958). Thus, if the subcontractor refuses to perform following the award of the contract, the general contractor may recover damages under the doctrine of promissory estoppel. *Ferrer*, at 835.

The *Ferrer* court listed the five elements of promissory estoppel:

> The prerequisites for an action based on promissory estoppel, a doctrine well recognized in this jurisdiction, have been stated as follows:
> (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.
> *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967).

(Citations omitted.) *Ferrer*, at 834.

Elements (1) through (3) are met in this case. Success's bid was a promise. Success could reasonably expect that

promise to cause Arango to change position by including the Success bid in Arango's prime bid. Success confirmed its bid 2 days after it was given, and Arango informed Success that it would be including that bid in its prime bid to be submitted 13 days later. Arango did include Success's bid in its prime bid, thereby changing its position.

The only element of promissory estoppel in dispute is whether Arango justifiably relied on Success's bid. Success contends that as a prudent and experienced general contractor, Arango should have known that Success's bid was too low for the job involved. To avoid Arango's summary judgment, Success had to present evidence supporting this assertion. *See Boardman v. Dorsett,* 38 Wn. App. 338, 340, 685 P.2d 615, *review denied,* 103 Wn.2d 1006 (1984). Success, however, has submitted no evidence that Arango should have known. The only other bid found in the record was from Tin Benders. Its bid was for $38,500 for sections 7A and 7B as compared to the $34,659 bid by Success.[1] There is nothing in the record to support an inference that Arango knew or should have known that Success had made a mistake.

Success raises the ultimate cover price that Arango had to pay as evidence that Arango should have known Success's bid was in error. But this bid was received after the award of the prime contract. Arango relied on Success's bid before the award of the prime contract; so the price Arango had to pay after the prime contract was granted is not evidence of Arango's knowledge at the time it relied on Success's bid. Therefore, the cover price does not support the proposition that Arango was not justified in relying on Success's bid. On the state of this record, Arango's motion for summary judgment should have been granted.

The judgment of the trial court is reversed and the cause

---

[1]While it is true that this bid was conditioned on Tin Benders receiving the bid for sections 7C, 7E, and 7F of the project, it is nevertheless a comparable bid and, without more, does not put Arango on notice that Success's bid was unusually low.

remanded with instruction to enter judgment in favor of Arango on its complaint for damages.

RINGOLD, A.C.J., and SWANSON, J., concur.