[No. 16757-3-II. Division Two. September 14, 1995.]

TACOMA ATHLETIC CLUB, INC., *Respondent*, v. INDOOR COMFORT SYSTEMS, INC., *Appellant*.

*Gary H. Branfeld* and *Branfeld & Associates*, for appellant.

*James A. Krueger, Harold T. Hartinger,* and *Vandeberg Johnson & Gandara*, for respondent.

WIGGINS, J. — Appellant Indoor Comfort Systems (Comfort Systems) sold and installed a dehumidification system for Tacoma Athletic Club (the Club). The trial court found that Comfort Systems breached the implied warranties of merchantability and fitness for a particular purpose and awarded damages to the Club under Washington's version of the Uniform Commercial Code (UCC). Comfort Systems argues that the UCC does not apply because this was a construction contract instead of a sale of goods. We adopt the "predominant factor" test used in most jurisdictions and hold that this was a sale of goods because the predominant aspect of this contract was a sale of goods, not the rendition of services. We hold, however, that the trial court used an improper measure of damages and we reverse and remand for recomputation of damages.

## FACTS

The parties tried this case to the superior court, sitting without a jury. The court entered findings of fact, few of which are contested by Comfort Systems. We accept the uncontested findings, and to the extent necessary, we

review the challenged findings to determine whether substantial evidence supports them.[1]

The Club operates an indoor swimming pool as part of its athletic facility. Humidity in the pool area was too high, causing water to drip from the ceiling, to run down the walls, to blister the paint, and to support the growth of mildew. In 1988, the Club decided to replace the dehumidification system in the pool area. Prior to bidding, the president of Comfort Systems visited the Club's pool area and the Club's president pointed out the problems caused by water collecting on the ceiling, windows, and walls. Knowing of the severe moisture problem in the pool area, Comfort Systems recommended a "Dri-Aire" dehumidification system manufactured by W.W. Manufacturing. At the request of the Club, Comfort Systems and W.W. Manufacturing took the Club's president to see two facilities where the Dri-Aire system had been installed. The Club president saw that the walls, windows, and ceilings were dry, and accepted a bid from Comfort Systems to replace the dehumidification system for $17,946.11. The Comfort Systems bid was between the two other bids of $12,950 and $21,640. Comfort Systems designed and installed the system, using existing duct work to save costs.

The moisture problems continued after Comfort Systems installed the new dehumidification system. Portions of the walls, ceilings, and windows remained wet. At one point a Comfort Systems technician measured the relative humidity in the pool area at seventy-five percent, far in excess of the fifty-one percent relative humidity above which moisture would begin to accumulate. Comfort Systems attempted unsuccessfully to solve the moisture problem. Eventually the Club hired another firm, CARECO, to maintain the system and to try to fix the condensation problem. Both the Club and CARECO attempted on

[1] *Federal Signal Corp. v. Safety Factors, Inc.*, 125 Wn.2d 413, 439, 886 P.2d 172 (1994).

numerous occasions to repair the system. The trial court found that these efforts, while not perfect, were proper.

Two factors, in addition to the repeated malfunctions of the system, caused the problems. First, the existing duct work was inadequate, impeding dehumidification. After the initial installation, Comfort Systems added additional duct work, but this failed to solve the problem. Second, the walls of the pool area were not insulated, impeding humidity control during cold months.

The Club filed this action for damages. Following a seven-day trial, the court concluded that this was a sale of goods subject to the UCC. The court concluded that the malfunctioning of the system rendered it unfit for the ordinary purpose for which it was supplied, breaching the implied warranty of merchantability under the UCC. The court also found that Comfort Systems knew the particular purpose for which the system was needed, the Club relied on Comfort Systems's expertise, and the system's failure constituted a breach of the implied warranty of fitness for a particular purpose under the UCC. The court awarded the following damages:

(1) The sum of $5,000 for the cost of repairs;

(2) The sum of $4,000 to insulate the walls; and

(3) The sum of $16,350 plus Washington State Sales Tax of $1,275.30 for its replacement costs.

Comfort Systems candidly concedes that substantial evidence supports the trial court's finding that Comfort Systems promised the Club that its system could keep the walls and ceilings of the swimming pool area dry. Comfort Systems appeals primarily from the conclusion that the UCC applies to this transaction and from the computation of damages.

ANALYSIS

Applicability of the UCC

Article 2 of the Uniform Commercial Code "applies to

transactions in goods . . . ."[2] " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."[3] Comfort Systems argues that its contract with the Club was not for the sale of "goods" because it included construction and installation, which required cutting into and patching parts of the building.

Prior Washington cases establish that construction contracts are not subject to the UCC. In *Arango Constr. Co. v. Success Roofing, Inc.*,[4] the Court of Appeals held that a contract to install a "built up" roof on existing buildings was not a contract for the sale of goods under the UCC. The *Arango* court relied on a Washington comment to the definition of "goods." According to the Comment, the UCC continues in effect the earlier interpretation that the Uniform Sales Act (USA) did not apply to construction contracts: " 'This section rephrases the coverage stated in USA . . . (RCW 63.04.750), implicitly continuing exclusion of construction, service and real property transactions.' "[5] The court rejected the argument of one party that the contract was subject to the UCC because it involved predominantly materials and only incidentally labor: "Our cases, however, do not distinguish contracts for work, labor, and materials in which the materials were a substantial part of the contract."[6] *Arango* also relied on *Christiansen Bros., Inc. v. State*,[7] in which the Washington Supreme Court held that a contract for the mechanical work construction on a fifteen-story building and a three-story building was not a sale of goods, observing that Article 2 of the UCC does not apply to

[2]RCW 62A.2-102.

[3]RCW 62A.2-105(1).

[4]46 Wn. App. 314, 317-20, 730 P.2d 720 (1986).

[5]46 Wn. App. at 317 (quoting RCWA 62A.2-102 cmts. (1965)).

[6]46 Wn. App. at 319.

[7]90 Wn.2d 872, 877, 586 P.2d 840 (1978), *construed in Arango*, 46 Wn. App. at 318-19.

construction contracts. Other Washington cases similarly held that the USA, the precursor to Article 2 of the UCC, did not apply to contracts for "work, labor, and materials."[8]

But *Arango* and *Christiansen Bros.* do not resolve this case because they do not help us determine whether Comfort Systems and the Club entered into a "construction contract." Both cases interpreted contracts that seemed clearly to be construction contracts; neither case provides an analytical test to classify contracts.

█ The majority of other jurisdictions use the predominant factor test to analyze contracts for the sale of goods and services: if the sale of goods dominates, Article 2 governs; if the sale of services dominates, Article 2 is inapplicable.[9] An A.L.R. Annotation lists cases from 31 states and the District of Columbia applying the predominant factor test.[10] The Ninth Circuit has referred to the test as the "modern trend;"[11] indeed, the Annotation appears not to list a single case that has rejected the test. Comfort Systems argues incorrectly that three of the annotated cases rejected the predominant factors approach. To the contrary, all three cases applied the predominant factors test and simply found that the sale of services dominated the particular contract, not the sale of goods.[12]

A 1974 leading case often cited for the test is the Eighth

---

[8]*Crystal Recreation, Inc. v. Seattle Ass'n of Credit Men*, 34 Wn.2d 553, 558, 209 P.2d 358 (1949); *Whatcom Builders Supply Co. v. H. D. Fowler, Inc.*, 1 Wn. App. 665, 668, 463 P.2d 232 (1969).

[9]Annotation, Sonja A. Soehnel, *Applicability of UCC Article 2 to Mixed Contracts for Sale of Goods and Services*, 5 A.L.R.4th 501, 505 (1981).

[10]5 A.L.R.4th 501 (1981 & Supp. 1994) (and cases cited therein).

[11]*United States v. Haas & Haynie Corp.*, 577 F.2d 568, 572 n.2 (9th Cir. 1978).

[12]*Cork Plumbing Co. v. Martin Bloom Assocs., Inc.*, 573 S.W.2d 947, 958 (Mo. Ct. App. 1978); *Air Heaters, Inc. v. Johnson Elec., Inc.*, 258 N.W.2d 649, 652, 5 A.L.R.4th 489 (N.D. 1977); *Van Sisten v. Tollard*, 95 Wis. 2d 678, 683-84, 291 N.W.2d 636 (1980).

Circuit decision in *Bonebrake v. Cox*,[13] in which the court considered a contract for the sale and installation of bowling lanes and equipment. The Eighth Circuit held that a "mixed contract" for sale of both goods and labor can be subject to Article 2, observing that services " 'always play an important role in the use of goods, whether it is the service of transforming the raw materials into some usable product or the service of distributing the usable product to a point where it can easily be obtained by the consumer.' "[14] The Eighth Circuit stated an oft-quoted formula for the predominant factor test:

> The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e. g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e. g., installation of a water heater in a bathroom).[15]

Applying the test, the Eighth Circuit looked to the language of the contract, the list of equipment sold, and the warranty given in the contract for the equipment. The court concluded that the predominant aspect of the contract was the sale of goods.

We adopt the predominant factor analysis as the appropriate test under Washington's version of the UCC. Article 1, section 102 of the UCC provides:

> (1) This Title shall be liberally construed and applied to promote its underlying purposes and policies.

> (2) Underlying purposes and policies of this Title are

> (a) to simplify, clarify and modernize the law governing commercial transactions;

> (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

---

[13]499 F.2d 951 (8th Cir. 1974).

[14]499 F.2d at 958-59 (quoting Robert J. Nordstrom, *Handbook of the Law of Sales* 47 (1970)).

[15]499 F.2d at 960 (footnotes omitted).

(c) to make uniform the law among the various jurisdictions.[16]

The predominant factor test fulfills two of the purposes of the UCC by clarifying and simplifying the law. The overwhelming acceptance of the test fulfills the purpose of making the law uniform among different jurisdictions. The clarification of the law regarding mixed contracts will simplify the resolution of disputes arising out of these contracts by better enabling the parties to identify and apply the controlling law.

We now analyze this case under the predominant factor test. The proper classification of a contract under the test is a factual issue.[17] Here the trial court entered a conclusion of law that, "The contract entered into between [the Club] and [Comfort Systems] was for the sale of goods, covered by the UCC, as adopted by the State of Washington." "[A] finding of fact erroneously described as a conclusion of law is reviewed as a finding of fact."[18] We review this conclusion/finding to determine whether it is supported by substantial evidence.[19]

Substantial evidence supports the trial court's conclusion that the Comfort Systems/Club contract was for the sale of goods. The negotiations leading up to the contract focused on the goods, not the services, aspect of the sale. Comfort Systems recommended a specific product to the Club, Dri-Aire dehumidifiers. The Club president insisted on viewing other facilities at which Dri-Aire dehumidifiers had been installed. The written contract predominantly lists the goods being sold, although it also refers to services:

Dri-Aire 4 ton dehumidification systems
with controls and ductwork $14,950.00

---

[16]RCW 62A.1-102.

[17]*United States v. City of Twin Falls*, 806 F.2d 862, 870 (9th Cir. 1986), *cert. denied*, 482 U.S. 914 (1987); *Baker v. Compton*, 455 N.E.2d 382, 386 (Ind. Ct. App. 1983).

[18]*Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

[19]*Id.* at 393.

| | |
|---|---|
| Additional high voltage wiring | $ 1,400.00 |

System includes: Low voltage control wiring, crane, back draft dampers, filters, sheet metal fittings, installation labor, sheet metal ductwork, and start, test, and balance as per manufacturer's specs.

One year warranty on all parts & labor. Additional equipment & piping & installation for heating pool water $ 3,120.00

The contract states that the "system includes" labor. This language clearly suggests that the subject of the sale is "the system," with the labor incidental to the system. The Club also received a one-year warranty from the manufacturer for the Dri-Aire dehumidifiers.

The Indiana Court of Appeals held that Article 2 applied to a similar contract in *Baker v. Compton*.[20] There the contractor agreed to sell and install thirteen gas furnaces, thirteen electric air conditioners, and ten water heaters as part of the renovation of a building.[21] We similarly conclude that the predominant aspect of this contract is the sale of goods with the accompanying labor necessary to install, start, test, and balance the resulting system. We uphold the trial court's conclusion/finding that this was a sale of goods.

### Damages

██ Control Systems does not challenge the trial court's findings that the system was inadequate, but contends that the trial court incorrectly computed and awarded damages to the Club. We review a damage award

[20]455 N.E.2d at 387.

[21]455 N.E.2d at 384.

to determine whether substantial evidence supports the findings of fact and whether the findings support the trial court's conclusions of law and judgment.[22] Once the buyer establishes the fact of loss with certainty, uncertainty regarding the extent or amount of loss will not prevent recovery.[23] Evidence of damage is sufficient if it affords a reasonable basis for estimating the loss.[24]

Section 714 of Article 2 of the UCC defines the measure of damages for breach of warranty where the buyer has accepted the goods and has not revoked acceptance of the goods.[25] Section 2-714 provides:

(1) Where the buyer has accepted goods and given notification . . . [the buyer] may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.[26]

We evaluate each element of damages awarded by the trial court under section 2-714.

Replacement Cost Plus Cost To Insulate. The trial court awarded the total contract price paid by the Club as "replacement costs" plus $4,000 to insulate the walls. We cannot determine from the findings of fact or from the

[22]*Federal Signal*, 125 Wn.2d at 439; *Willener*, 107 Wn.2d at 393.

[23]*Lewis River Golf, Inc. v. O.M. Scott & Sons*, 120 Wn.2d 712, 717-18, 845 P.2d 987 (1993) (quoting Roy R. Anderson, *Incidental and Consequential Damages*, 7 J.L. & COM. 327, 395-96 (1987)).

[24]*Federal Signal*, 125 Wn.2d at 438-39 (citing RCWA 62A.2-106 official cmt. 1 (1965)).

[25]*Federal Signal*, 125 Wn.2d at 438.

[26]RCW 62A.2-714.

trial court's letter decision why the court awarded these damages. We cannot relate this award to the allowable damages defined by section 2-714. This damage award cannot be sustained under subsection (1) as "the loss resulting in the ordinary course of events from the seller's breach,"[27] because no evidence suggests that the Club lost this amount because of the breach of warranties. Nor can it be sustained under subsection (3), because no evidence shows any incidental or consequential damages of this amount.

It is possible that the trial court considered this amount to be the appropriate damage under subsection (2), as the difference between the value of the goods as accepted and the value of the goods as warranted. This theory requires two findings: the value of the goods as warranted equals the purchase price plus the cost of insulating the walls; and, the value of the goods as accepted equals zero. Professors White and Summers explain that the purchase price may be an appropriate measure of damages if the evidence permits a finding that the value of the goods is zero:

> There are many cases in which the goods will be irreparable or not replaceable and therefore the costs of repair or replacement cannot serve as a yardstick of the buyer's damages. In such cases, the court will have to determine by some other measure the difference between the value of the goods *as warranted* and the value of the goods as accepted. The fair market value at the time of acceptance is the most appropriate measure of the value of the goods as warranted. . . . When fair market value cannot be easily determined, or the parties do not raise it as a measure of value, the purchase price may turn out to be strong evidence of the value of the goods as warranted.
>
> When repair or replacement is not possible, determining the value of defected goods as accepted may be more difficult than ascertaining the value as warranted. . . . In a few cases, courts have found (or allowed the jury to find) that the value

---

[27]RCW 62A.2-714(1).

of accepted goods was zero and permitted the buyer to recover the purchase price.[28]

In this case, however, there are no findings to support this theory, and the parties have failed to identify any evidence to support such findings.

The trial court might also have concluded that the contract price plus the insulation cost equaled the cost of repairing the system so that it would conform to the warranties. The cost of replacement or repair is a common measurement of the difference between the value as is and the value as warranted.[29] But the trial court's letter decision suggests that the court intended this measure of damages to be the cost of replacement, not the cost of repair. Moreover, the letter ruling states that the cost of replacement "is unclear from the evidence since the bids received in the past ranged widely in amount." Accordingly, we cannot affirm the award on the ground that it represents the cost of repairs.

■ Lacking adequate findings, the damage award may overcompensate the Club. The Club did not choose to insulate the walls, and Comfort Systems did not contract to do so. The purpose of section 2-714 is to give the Club the benefit of its bargain, not to leave it in a better position than before the contract.

■ The Club has the burden of proving its damages,[30] and it has failed to justify this award. We reverse and remand to the trial court for recomputation of damages under section 2-714 based on findings supported by substantial evidence.

■■ Repair Costs. Comfort Systems assigns error to

[28]James J. White & Robert S. Summers, 1 *Uniform Commercial Code* § 10-2, at 506-07 (3d ed. 1988) (footnotes omitted).

[29]*Federal Signal*, 125 Wn.2d at 440 (" '[T]he overwhelming judicial consensus has been that [repair] costs are strong evidence of the difference between the value of the goods as accepted and their value as warranted.' ") (quoting 2 Roy R. Anderson, *Damages Under the Uniform Commercial Code* § 10.06, at 16 (1992)).

[30]*Federal Signal*, 125 Wn.2d at 438.

the awarding of the repair costs, arguing that the repair costs were not separated from the costs associated with normal and preventative maintenance. Under section 2-714(1), the buyer who accepts nonconforming goods may recover damages for "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."[31] Reasonably incurred repair costs are damages "resulting in the ordinary course of events" from the breach of warranty and were properly awarded for the breach of warranty.[32] Alternatively, the repair costs may be viewed as incidental damages under Article 2, section 715(1).[33]

To determine the cost of repair the Club's manager testified that he added up all the invoices related to the dehumidification system and took twenty-five percent off the invoices where he could not separate the costs of routine maintenance. The record supports this breakdown of repair costs. The evidence from the record is sufficient to warrant the trial court's concluding that the Club was entitled to recover at least a portion of repair and maintenance costs it reasonably expended to lessen the breach of warranty.[34] Substantial evidence supports the trial court's findings regarding Comfort Systems' and Careco's efforts to repair and maintain the dehumidification system.[35]

Cost of Insulation as Maximum Damages. Comfort Systems argues that insulating the walls will solve the problems with the system and that the cost of insulation is therefore the maximum damage allowable. Comfort Systems presented expert testimony to support this theory, but the trial court rejected a finding proposed by Comfort Systems that insulating the walls would solve the

[31] RCW 62A.2-714(1).

[32] *Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 366, 623 P.2d 710 (1981) (affirming award of repair costs to fix defective mobile home).

[33] RCW 62A.2.715(1). *See* White & Summers, *supra*, § 10-3, at 510-12.

[34] *See Glaspey v. Wool Growers' Serv. Corp.*, 151 Wash. 683, 692, 277 P. 70 (1929).

[35] *Federal Signal*, 125 Wn.2d at 438-39.

problems. Substantial evidence supports the trial court's rejection of Comfort Systems's theory. The Club presented expert testimony that the dehumidification system was inadequate for a commercial installation: the system brought in insufficient outdoor air to meet code requirements; the system lacked a temperature control; air flow through the dehumidifiers was poorly designed and inadequate, causing one of the units to freeze up; indoor equipment had been installed outdoors on the roof; and accessibility for maintenance was very poor. The trial court did not err in refusing to limit the damages to the cost of insulating the walls.

 Mitigation of Damages. Comfort Systems argues that the Club failed to mitigate damages when the Club failed to make a claim for the defective compressor under the warranties provided by W.W. Manufacturing. The burden of proof as to the mitigation of damages is on the party asserting the requirement; that burden shifts once the opposing party shows that the injured party had alternatives to minimize damages.[36] Comfort Systems did not show which items were recoverable under warranty and thus failed to meet its burden.

### CONCLUSION

In summary, we affirm the trial court's finding/conclusion that the UCC governs this contract, and the award of damages for repair costs. We reverse the damage award for the cost of the system plus the cost of insulating the walls and remand for a proper determination of damages under article 2, section 714.

SEINFELD, C.J., and MORGAN, J., concur.

Review denied at 128 Wn.2d 1020 (1996).

---

[36]*Harper & Assocs. v. Printers, Inc.*, 46 Wn. App. 417, 424, 730 P.2d 733 (1986), *review denied*, 108 Wn.2d 1002 (1987).