[No. 20857-1-II. Division Two. September 4, 1998.]

CONDON BROS., INC., *Appellant*, v. SIMPSON TIMBER COMPANY, *Respondent*.

---

[22]36 Wn. App. 324, 674 P.2d 204 (1983).

[23]*Donovan*, 36 Wn. App. at 325 (emphasis added).

*Amy C. Clemmons* of *Evans, Craven & Lackie, P.S.,* for appellant.

*John R. Nelson* of *Preston Gates & Ellis,* for respondent.

MORGAN, J. — Condon Brothers, Inc., appeals an adverse jury verdict in its breach-of-contract suit against Simpson Timber Company. It claims the trial court erred by refusing to apply the UNIFORM COMMERCIAL CODE (UCC) and by excluding certain hearsay. We affirm.

Simpson Timber Company owned and operated a private railroad for hauling timber. The railroad included a 400-foot-long trestle known as the Neby bridge.

In 1993, Simpson had no further need for a five-mile section of its railroad. As a result, it wanted a contractor to "take up" that section and buy the rails, ties, and other salvageable materials. According to Condon, it was possible to take up the section without harming the land.

In June 1993, Condon submitted a written offer of $25,000 for the right to take up the section and retain the rails, ties, and other salvageable materials. A competitor,

Pacific Railroad Salvage (PRS), bid $40,000. Simpson did not accept either offer.

On December 9, 1993, Condon submitted a second written offer. It proposed to redeck the Neby bridge and take up the five-mile section of railroad that Simpson wanted to abandon, in exchange for which it would receive the rails, ties, and other salvageable materials. The written offer did not state when Condon would perform the work, although it did state that Condon would complete the work within a 14-day window. Apparently, the parties discussed orally that Condon would perform the work in July 1994.[1]

On January 5, 1994, Simpson added two terms to the face of Condon's December 9 offer: Simpson would retain one mile of angle bars and tie plates, and Condon would post a $100,000 performance bond. After making these changes, Simpson signed on the face of the offer—although not in the space labelled "acceptance of proposal"—and returned the offer to Condon. The parties dispute whether Simpson manifested an acceptance, and whether Condon ever agreed to the additional terms.

On January 6, 1994, John Weidemann telephoned Simpson's main switchboard. As an employee of A&K Railroad Materials, another of Condon's competitors, he was interested in purchasing any rails, ties, and related materials that Simpson was no longer using. He asked the switchboard operator to connect him with Frank Brehmyer, whom he thought was Simpson's railroad superintendent. The switchboard operator said Brehmyer had retired, so Weidemann asked to speak to whoever was in charge of the railroad. Indicating that "she believed that the railroad department was now under the mill department,"[2] the switchboard operator transferred him to a man whose name Weidemann did not record. Weidemann told

---

[1] No one contends that Condon and Simpson were negotiating a contract that was predominantly for services as opposed to goods. *See Tacoma Athletic Club, Inc. v. Indoor Comfort Sys., Inc.*, 79 Wn. App. 250, 902 P.2d 175 (1995), *review denied*, 128 Wn.2d 1020 (1996). Therefore, we do not consider that question.

[2] Clerk's Papers at 31.

the man "who I was and what I was calling about," and the man immediately responded "that the ten miles had been contracted to Condon Brothers."[3]

On January 6, 1994, a Simpson employee named Mike Treadwell was in charge of both the mill and the railroad. He was "the sole employee with authority to negotiate [the] sale of the railroad at issue in this case."[4] According to him, he did not participate in the conversations described by Weidemann.

. On or after January 6, Weidemann wrote the name "Jim Tinsdale" next to his notes of the January 6 conversation. Later, he was not sure whether the name related to his January 6 phone call to Simpson, or to some other activity. Simpson did not employ a person named Jim Tinsdale.

Sometime after January 6, Weidemann again called Simpson about rails and ties, and he again was referred to the person he had talked with on January 6. Again, however, he did not get the name of the person he spoke with.

In the spring, Simpson decided the Neby bridge should be redecked in May, not July. It asked Condon to accelerate its schedule, but Condon said it would have a problem doing that. Simpson then found and hired another contractor, who redecked the bridge in May. Simpson also sold the five miles of rails, ties, and related materials to PRS for $72,500.

In August, Condon sued Simpson for breach of contract. Relying on the UCC, and in particular on RCW 62A.2-207,[5] Condon claimed that it had made an offer on December 9;

---

[3]*Id.* at 32.

[4]*Id.* at 49.

[5]RCW 62A.2-207 provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

that Simpson had accepted that offer on January 5; that a contract had resulted; and that Simpson had breached the contract. Relying on the common law, Simpson claimed that its response of January 5 was not an acceptance, and that no contract had been formed.

Before trial, Simpson moved for an order declaring that the case was governed by the common law of contracts rather than article 2 of the UCC. It also moved for an order excluding, on hearsay grounds, Weidemann's description of his January 6 phone call to Simpson. The trial court granted both motions.

In May 1996, the trial court convened a jury trial. At its end, the jury was asked by special interrogatory whether Condon and Simpson had achieved a meeting of the minds. The jury answered "no" and returned a verdict for Simpson. Condon then filed this appeal.

I.

Condon claims that the case is governed by article 2 of the UCC, and that the trial court erred by ruling otherwise. Article 2 applies to transactions in goods, but not to transactions in real property.[6] The term "goods" generally includes things "movable at the time of identification to

---

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Title.

[6]RCW 62A.2-102 (Article 2 applies to transactions in goods); RCWA 62.A.2-102 Washington comments (Article 2 generally does not apply to transactions in real property).

the contract for sale."[7] The term also includes things attached to realty (and thus generally not movable at the time of identification to the contract for sale) if those things are "described in the section on goods to be severed from realty (RCW 62A.2-107)."[8] That section provides:

> (1) A contract for the sale of minerals or the like including oil and gas or a structure or its materials to be removed from realty is a contract for the sale of goods within this Article if they are to be severed by the seller . . . .
>
> (2) A <u>contract</u> for the sale apart from the land of growing crops or <u>other</u> *things* attached to realty and capable of severance without material harm thereto **but not described in subsection (1)** or of timber to be cut is a contract for the sale of goods within this Article whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting . . . .[9]

█ █ We first consider whether we are dealing with a "structure" within the meaning of subsection (1). Because the UCC uses but does not define the term "structure," we look to the dictionary definition of the term.[10] WEBSTER'S THIRD INTERNATIONAL DICTIONARY defines "structure" as "something constructed or built," or as "something made up of more or less interdependent elements or parts."[11] BLACK'S LAW DICTIONARY defines "structure" as

---

[7]RCW 62A.2-105(1). Condon argues the railroad materials at issue here were movable for purposes of RCW 62A.2-105(1). Under that statute, Article 2 applies if goods are movable "at the time of identification to the contract for sale." The materials in issue here were identified to a contract, if at all, on January 5, 1994. On that date, they were attached to realty and not movable. Thus, this argument fails.

[8]RCW 62A.2-105(1).

[9]RCW 62A.2-107 (underlining added; italics added; bold added). The omitted portion of each subsection goes on to state whether a transaction otherwise within the UCC constitutes a contract to sell, a present sale, or both. *See* RCW 62A.2-106(1). Although Condon seems to argue to the contrary, that distinction has no pertinence here.

[10]*Department of Licensing v. Lax*, 125 Wn.2d 818, 822, 888 P.2d 1190 (1995); *State v. Sunich*, 76 Wn. App. 202, 206, 884 P.2d 1 (1994).

[11]WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2267 (1969).

[a]ny construction, or any production or piece of work artificially built up or composed of parts joined together in some definite manner. That which is built or constructed; an edifice or building of any kind.[12]

WEBSTER's gives examples that include a dam, building, highway, road, *railroad*, excavation, and "posts or stakes across a stream."[13] Based on these definitions, we hold that a five-mile section of railroad, affixed to the land at the time a contract is formed, is a "structure" for purposes of subsection (1). Thus, the general problem here is when a contract for the sale of a "structure" attached to land falls within article 2 of the UCC.

We begin by considering subsection (1) of RCW 62A.2-107. A contract for the sale of a "structure" falls within article 2 by virtue of that subsection only if the seller is to sever. The parties agree that the seller was not to sever here. Therefore, subsection (1) does not bring the transaction at issue within article 2.

We next consider subsection (2), the effect of which the parties dispute. According to Condon, a contract for the sale of a "structure" that the buyer is to sever falls under subsection (2), and thus within the UCC, so long as the buyer can sever the structure without material harm to the land. According to Simpson, a contract for the sale of a "structure" that the buyer is to sever can never fall under subsection (2), or within the UCC.

At bottom, the parties' disagreement is grammatical. Condon is really asserting that the phrase, "but not described in subsection (1)," which we put in bold above, modifies the noun "contract," which we underlined above. If that is right, we should interpret subsection (2) as if it read: "A contract . . . not described in subsection (1)[, including a contract for the sale of a structure that is not to be severed by the seller,] . . . is a contract for the sale of goods within this Article," so long as the structure can be

---

[12]BLACK's LAW DICTIONARY 1424 (6th ed. 1990).

[13]WEBSTER's at 2267 (emphasis added).

severed without materially harming the land. Simpson, on the other hand, is really asserting that the phrase, "but not described in subsection (1)," which we put in bold above, modifies the noun "things," which we italicized above. If that is right, we should interpret subsection (2) as if it read: "A contract for the sale . . . of . . . things . . . not described in subsection (1) . . . is a contract for the sale of goods within this Article" so long as the things can be severed from the land without materially harming the land.

Looking to the intent of the drafters,[14] we hold that Simpson is right. The text of subsection (2) uses the words "things [a] attached to realty and [b] capable of severance without material harm thereto but [c] not described in subsection (1)." The three lettered phrases are connected and parallel, and it is seems unlikely that [c] was intended to modify "contract" when [a] and [b] necessarily modify "things."

■ Moreover, this view is confirmed by the official comment to U.C.C. § 2-107. It states that subsection (1) "applies only if the . . . structures 'are to be severed by the seller'. *If the buyer is to sever, such transactions are considered contracts affecting land,"* and thus such contracts are not within the UCC.[15] Accordingly, we conclude that a contract to sell a "structure" is not within article 2 if the buyer is to sever the "structure" from the land; that the contract in issue here was not within the UCC; and that the trial court did not err by applying the common law of contracts.

## II.

Condon claims that the trial court erred by not admit-

---

[14]*City of Yakima v. International Ass'n of Firefighters,* 117 Wn.2d 655, 669, 818 P.2d 1076 (1991) (goal of statutory construction is to give effect to the intent of the legislature); *Cherry v. Municipality of Metro. Seattle,* 116 Wn.2d 794, 799, 808 P.2d 746 (1991).

[15]RCWA 62A.2-102 Washington comments (U.C.C. § 2-102 "implicitly continu[es] exclusion of . . . real property transactions").

ting the statement of the Simpson employee who spoke with Weidemann on January 6, 1994.[16] Condon was offering the statement to prove that Simpson had earlier entered into a contract with Condon, which is the very proposition that the Simpson employee was intending to assert. Thus, Condon was offering the statement to prove the truth of the matter asserted,[17] and the statement was inadmissible hearsay,[18] unless it fell within a hearsay exemption or exception.[19]

Condon claims that the employee's statement is exempt from the hearsay rule because it falls within ER 801(d)(2)(iii) and (iv). ER 801(d)(2)(iii) and (iv) provide that a statement is not hearsay, even though offered to prove the truth of the matter asserted, if it is offered against a party and is "(iii) a statement by a person authorized by the party to make a statement concerning the subject, or (iv) a statement by the party's agent or servant acting within the scope of the authority to make the statement for the party . . . ."[20] In Washington at least, both are grounded on the RESTATEMENT OF AGENCY, which provides

---

[16]According to Condon, it showed that Weidemann spoke with a Simpson employee. In our view, it showed that Weidemann spoke to a Simpson employee, *see* ER 901(4), ER 901(6), but it did not show the identity or the authority of the person with whom Weidemann spoke.

[17]*See* ER 801(c).

[18]ER 801(c); ER 802.

[19]*See* ER 801(d); ER 803-04.

[20]ER 801(d)(2)(iii) and (iv) seem to state the same principle, notwithstanding the usual rule of construction that, whenever possible, a statute must be interpreted so as to avoid surplusage and give all of its language meaning. *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 530, 844 P.2d 389 (1993); *Sacred Heart Med. Ctr. v. Department of Licensing*, 88 Wn. App. 632, 639, 946 P.2d 409 (1997). The court interprets court rules in the same manner as statutes. *See State v. Greenwood*, 120 Wn.2d 585, 592, 845 P.2d 971 (1993). Washington's Evidence Rules are patterned after the Federal Rules of Evidence. FED. R. EVID. 801(d)(2) provides that a statement is not hearsay if it is offered against a party and is either "(C) a statement made by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ." Subsection (C) states the traditional "speaking agent" rule; it renders an agent's statement admissible against a principal if the agent had authority to speak on the principal's behalf. Subsection (D) significantly expands the traditional speaking-agent rule; it renders an agent's

that the "statements of an agent to a third person are admissible in evidence against the principal to prove the truth of the facts asserted in them . . . if the agent was authorized to make the statement or was authorized to make, on the principal's behalf, any statements concerning the subject matter."[21]

■ ■ Whether a declarant is a speaking agent for purposes of ER 801(d)(2)(iii) and (iv) is a question of preliminary fact governed by ER 104(a).[22] Like other such hearsay-related questions of preliminary fact,[23] it is decided

---

statement admissible against a principal, even if the agent lacked authority to *speak* on the principal's behalf, so long as the agent was speaking about a subject on which the agent had authority to *act* on the principal's behalf, before being fired or otherwise terminated. *See* 56 F.R.D. 183, 298, FED. R. EVID. 801(d)(2) advisory committee's note. Although the drafters of Washington's rules of evidence followed the federal rules in most respects, they commented that they wanted to reject FED. R. EVID. 801(d)(2)(D) and retain the traditional "speaking agent" rule, as follows:

> The Washington cases have not adopted the rule of broader admissibility expressed by [FED. R. EVID. 801(d)(2)(D)] . . . .
>
> Later [Washington] decisions have phrased the rule . . . in terms of whether the agent was authorized to make the statement on behalf of the principal . . . . This has become known as the "speaking agent" approach and has continued to be applied in relatively recent decisions . . . . The drafters of the Washington rule felt that existing Washington law . . . reflected the better policy and deleted the language in the federal rule which would have broadened the admissibility of statements by agents.

ER 801 cmt. section (d). It affirmatively appears, then, that the drafters intended ER 801(d)(2)(iii) and (iv) to have the same meaning.

[21]RESTATEMENT (SECOND) OF AGENCY § 286; *Passavoy v. Nordstrom, Inc.*, 52 Wn. App. 166, 169, 758 P.2d 524 (1988), *review denied*, 112 Wn.2d 1001 (1989).

[22]ER 104(a) provides:

> **(a) Questions of Admissibility Generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the Rules of Evidence, except those with respect to privileges.

[23]As used here, the phrase, "hearsay-related questions of preliminary fact" includes questions of fact that relate to a hearsay exemption (ER 801(d)) or a hearsay exception (ER 803-04). It does not necessarily include questions that relate to the definition of hearsay (ER 801(c)), although it may include some of them. *See* ER 801(a); *In re Dependency of Penelope*, 104 Wn.2d 643, 654, 709 P.2d 1185 (1985). Questions that relate to an exemption or exception include whether a declarant spoke under oath, subject to penalty of perjury (ER 801(d)(1)(i)); whether a declarant was a coconspirator (ER 801(d)(2)(v)); whether a declarant

by the trial judge.[24] The judge is not bound by the rules of evidence, except those pertaining to privileges,[25] and he or she may use the offered statement itself,[26] keeping in mind that the offered statement alone is not sufficient to establish the fact in question.[27]

 A matter not expressly resolved in ER 104(a) is whether the trial judge uses a preponderance-of-the-evidence test or a sufficiency-of-the-evidence test when deciding a hearsay-related question of preliminary fact. If the trial judge uses a preponderance test, he or she has discretion to weigh conflicting information and accept that which is more probably true than not true. If the trial judge uses a sufficiency test, he or she must take the information in the light most favorable to the proponent, accepting that, if any, which favors the proponent.

The federal authorities hold that a trial judge uses a preponderance test when dealing with a hearsay-related question of preliminary fact. In *Bourjaily v. United States*,[28] the United States Supreme Court held that a trial court should use a preponderance test when dealing with a question of preliminary fact under FED. R. EVID. 801(d)(2)(E).[29] In *United States v. Franco*,[30] a case involving the business-records exception to the hearsay rule, the Seventh Circuit

spoke immediately after perceiving the event (ER 803(a)(1)); whether a declarant spoke under the stress of excitement (ER 803(a)(2)); whether a declarant spoke for purposes of medical diagnosis or treatment (ER 803(a)(4)); whether a declarant was acting under a business duty (RCW 5.45.020; ER 803(6)); whether a declarant is unavailable at the time of trial (ER 804(a)); and many others.

[24]ER 104(a).

[25]ER 104(a).

[26]This is often referred to as "bootstrapping." *See United States v. Bourjaily*, 483 U.S. 171, 176, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[27]*State v. Guloy*, 104 Wn.2d 412, 420, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986); *see also* FED. R. EVID. 801(d)(2) (1997 amendment, discussed *infra* note 32 and accompanying text).

[28]483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[29]*Bourjaily*, 483 U.S. at 176. *See also Guloy*, 104 Wn.2d at 420 (holding the same with respect to ER 801(d)(2)(v)).

[30]874 F.2d 1136 (7th Cir. 1989).

extrapolated *Bourjaily*'s preponderance test to all hearsay-related questions of preliminary fact:

> When making preliminary factual inquiries about the admissibility of evidence under a hearsay exception, the district court must base its findings on the preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 2778, 97 L. Ed. 2d 144 (1987).[31]

Moreover, the federal government recently amended FED. R. EVID. 801(d)(2) so as to apply *Bourjaily* not only to FED. R. EVID. 801(d)(2)(E), which is analogous to ER 801(d)(2)(v), but also to FED. R. EVID. 801(d)(2)(C), which is analogous to ER 801(d)(2)(iii) and (iv). The amendment states:

> The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

The accompanying comment states:

> Rule 801(d)(2) has been amended in order to respond to three issues raised by *Bourjaily v. United States*, 483 U.S. 171 (1987). First, the amendment codifies the holding in *Bourjaily* by stating expressly that a court shall consider the contents of a coconspirator's statement in determining "the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered." *According to Bourjaily, Rule 104(a) requires these preliminary questions to be established by a preponderance of the evidence.*

> Second, the amendment . . . provides that the contents of the declarant's statement do not alone suffice to establish a conspiracy . . . .

> Third, *the amendment extends the reasoning of Bourjaily to statements offered under subdivisions (C) and (D) of Rule 801(d)(2).* In *Bourjaily*, the Court rejected treating founda-

---

[31]*Franco*, 874 F.2d at 1139.

tional facts pursuant to the law of agency in favor of an evidentiary approach governed by Rule 104(a). The Advisory Committee believes it appropriate to treat analogously preliminary questions relating to the declarant's authority under subdivision (C) . . . .[32]

At least impliedly, then, the federal government has applied *Bourjaily*'s preponderance holding to the federal rules' version of the speaking-agent exemption.

These federal authorities supersede earlier federal cases to the contrary, one of which is *United States v. Flores*.[33] In *Flores*, the Ninth Circuit ruled that a trial court should use a sufficiency test when deciding a question of preliminary fact pursuant to ER 104(a).[34] It expressly rejected the preponderance standard espoused by the Seventh Circuit in *United States v. Santiago*.[35] Several years later, however, the *Bourjaily* court adopted the preponderance standard that the Ninth Circuit had rejected, and in 1997 FED. R. EVID. 801(d)(2) was amended to extend that standard, at least impliedly, to the federal courts' version of the speaking-agent exemption, FED. R. EVID. 801(d)(2)(C) and (D). Accordingly, *Flores* is no longer good law with respect to a hearsay-related question of preliminary fact.

These federal authorities are consistent with principle. The primary purpose of the sufficiency-of-evidence test is division of function between judge and jury. It is for the judge to decide whether a factual issue exists, and, if one does exist, for the jury to decide how it should be resolved. Or, in alternative terms, the judge decides whether the fact in issue *could* be found according to the appropriate burden of persuasion, and the jury decides whether the fact in issue *should* be found according to the appropriate burden of

---

[32] 28 U.S.C.A. Rule 801 advisory committee's notes to 1997 Amendment (West Supp. 1998) (emphasis added).

[33] 679 F.2d 173 (9th Cir. 1982), cited in 5B KARL B. TEGLAND, WASHINGTON PRACTICE § 349 n.19 (1989).

[34] *Flores*, 679 F.2d at 178.

[35] 582 F.2d 1128, 1134-35 (7th Cir. 1978).

persuasion. With a hearsay-related question of preliminary fact, the judge is the sole decision maker, and there is no division of function to be taken into account. Even if the judge resolves the question in favor of the proponent of the evidence, and thus admits the offered hearsay, the judge does not instruct the jury that it can use the hearsay only if it first finds that the preliminary fact has been established; on the contrary, the judge leaves the jury to accept or reject the hearsay according to whatever criteria the jury deems proper.[36] Accordingly, a preponderance standard is more appropriate than a sufficiency one when dealing with a hearsay-related question of preliminary fact.

Like the United States Supreme Court, the Washington Supreme Court has held for more than a decade that questions of preliminary fact under ER 801(d)(2)(v), the coconspirator exemption, should be decided according to a preponderance of the evidence.[37] In accord with the federal authorities discussed above, and because it would be needlessly complex to apply a preponderance standard under ER 801(d)(2)(v) but a sufficiency standard under ER 801(d)(2)(iii) and (iv), we conclude that a trial court deciding whether a particular agent was authorized to speak on behalf of a particular principal makes that decision according to a preponderance of the information presented.[38]

Here, Weidemann testified that he asked for the man in charge of the railroad on two occasions; that he spoke with the same person on each occasion; and that the person with whom he spoke seemed knowledgeable about the railroad's affairs. On the other hand, neither he nor anyone

---

[36]*See Soles v. State*, 119 So. 791 (Fla. 1929).

[37]*State v. Guloy*, 104 Wn.2d 412, 420, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986).

[38]Parenthetically, we do *not* rule that a trial judge is to use a preponderance standard when deciding every question of preliminary fact. The rules of evidence expressly provide that a judge must use a substantial-evidence standard, i.e., a sufficiency standard, when deciding a question of preliminary fact related to relevance, ER 104(b), personal knowledge, ER 602, authentication, ER 901, and, sometimes, the best evidence rule, ER 1008. There may be other instances as well.

290

else could be certain of whom he talked with, for he did not obtain (or at least recall) a name; he recorded a wrong name in his notes, although perhaps at a different time; and Treadwell, the person with authority to speak for Simpson, denied participating in the described conversation. Given this uncertainty, a reasonable person could remain unpersuaded that Weidemann more likely than not talked with Treadwell, or with any other speaking agent, and thus the trial court had discretion to rule in the manner that it did.

Affirmed.

SEINFELD and ARMSTRONG, JJ., concur.