101 P.3d 409 (2004)
153 Wash.2d 102
BANK OF AMERICA NT & SA f/k/a Seafirst Bank, a National Banking Institution, Petitioner,
v.
DAVID W. HUBERT, P.C., a Washington Corporation; David W. Hubert and Katharine Hubert, individually and the marital community, Respondents, and
M. Gail Kurpgewiet a/k/a M. Gail Williams and John Doe Williams, individually and the marital community, Defendants.
No. 73970-6.
Supreme Court of Washington, En Banc.
November 18, 2004.
*411 Erika Balazs, Jed William Morris, Spokane, for Petitioner.
Patrick N. Rothwell, Davis Rothwell Mullin Earle & Xochihua, Seattle, for Respondents.
MADSEN, J.
Bank of America challenges the Court of Appeals decision reversing the trial court's summary judgment in its favor. The issues are (1) whether Key Bank or Sterling Savings Bank is the payor bank under RCW 62A.4-105; (2) whether failure by a payor bank to dishonor an NSF check under the "midnight deadline" rule renders a collecting bank accountable; and (3) whether David W. Hubert, P.C. (Hubert P.C.) may be liable for negligent supervision where a paralegal managing the Interest on Lawyers Trust Account (IOLTA account) engaged in a check-kiting scheme. We reverse the Court of Appeals and reinstate the summary judgment.

FACTS
At the time relevant to this review David Hubert was a director of David W. Hubert P.C. operating under the name of Law Clinic Northwest in Spokane. Gail Williams was a paralegal operating Washington Paralegal Services, Inc., in the same building. Hubert P.C. engaged Ms. Williams to manage real estate closings. Williams prepared all of Hubert P.C.'s real estate closings and David Hubert was responsible for reviewing them. Williams was also responsible for generating Hubert P.C.'s checks for its real estate closing transactions and for getting David Hubert to sign them.
Hubert P.C. opened two IOLTA accounts with Bank of America (known as Seafirst Bank at that time) for real estate closing funds. Because Williams managed real estate closings for Hubert P.C., she was listed as an authorized signer for the IOLTA account # XXXXXXXX, the account at issue here, along with David Hubert and Katharine Hubert, his wife. Under the customer agreement for the IOLTA account, Hubert P.C. was to cover any deficiency in the account upon notice from Bank of America. The general terms of the agreement provided that in receiving checks or other items for deposit or collection, Bank of America acted only as a collecting agent and "assumes no responsibility beyond the exercise of due care" and further provided "[i]f we've given you provisional credit for a check ... and it is not paid, you agree that we may charge the amount of the item back to your account." Customer Agreement at 2. Clerks Papers (CP) at 46. The wire and internal transfer section of the customer agreement also provided that a customer "shall be liable for any loss or damage to which your negligence contributed or which resulted from unauthorized, fraudulent, or dishonest acts by your current and/or former authorized representatives. Such liability includes instances when a current or former authorized representative effects one or more funds transfers to your detriment." Customer Agreement at 41. CP at 85.
For several months in 1998, Williams was operating a check-kiting scheme using the IOLTA account at Bank of America as well as her personal accounts at Key Bank under the name of Washington Paralegal Services, Inc. (WPSI). To avoid detection, Williams changed the address on the IOLTA account so that the monthly statements would come to her home. Williams did not tell Hubert that she was having any financial difficulties and Hubert never asked to review statements for his IOLTA account.
Key Bank sold Williams' personal account to Sterling Savings Bank on June 12, 1998. Key Bank notified its customers of the sale of its accounts and authorized them to use previously printed checks for these accounts. The sale of the account transferred Key Bank's rights and responsibilities under the account agreement to Sterling Savings Bank.
Williams was taking money from the IOLTA account at Bank of America for her own use. On September 15, Williams executed three wire transfers from the IOLTA account totaling $171,710.61. The next day, she deposited two checks totaling $193,866.44 into the IOLTA account. The checks were payable to Hubert P.C. and were written on Key Bank checks. Bank of America provisionally credited the IOLTA account and forwarded *412 the checks to Key Bank for collection. Key Bank received them on September 17. On the same day, Williams gave Sterling Savings Bank a stop-payment order on a check of $94,413.94, one of the two checks. On September 18, both checks arrived at Fiserv, Sterling Savings Bank's check processing agent, and were processed. On September 19, Fiserv returned the checks to Bank of America without payment because of the stop-payment order for the one check and insufficient funds in Williams' account for the other.[1] Bank of America received the checks and sent a notice of dishonor for the checks to Hubert P.C. on September 22. On September 28, Bank of America withdrew provisional credit for the two checks deposited in the IOLTA account. After reconciliation of the IOLTA account, the negative balance was $63,853.46.
To recover the deficit, Bank of America filed suit in Spokane County Superior Court against Hubert P.C., pursuant to its contract with Hubert P.C., and against David and Katherine Hubert and Williams individually. Bank of America asserted a breach of contract and negligence in supervising Williams and failure to properly monitor the IOLTA account pursuant to the Rules of Professional Conduct (RPC).[2]
Among other affirmative defenses, Hubert P.C. and the Huberts alleged that Bank of America could not withdraw provisional credit for the checks deposited in the IOLTA account because Key Bank, the payor bank, did not dishonor the checks before the midnight deadline.[3] They also counterclaimed for damages, alleging that Bank of America failed to timely notify Hubert P.C. of the dishonor by Key Bank. Finally, they also sought damages for wrongful wire transfers.[4] As to the defense based on the midnight deadline, Bank of America countered that Sterling Savings Bank was the payor bank and that the payor bank met the midnight deadline. Alternatively, Bank of America argued that even if Key Bank was the payor bank, it would be excused from missing the midnight deadline because a fraud defense is available to the payor bank.
Both parties moved for summary judgment. The trial court granted summary judgment in favor of Bank of America on its contract claim. The court also granted summary judgment in the bank's favor on the negligence claim against Hubert P.C. However, the court denied summary judgment on the negligence claim against David Hubert in his individual capacity.[5] While the court dismissed most of the defendants' affirmative defenses, it ruled that Hubert individually could assert that Bank of America breached a general duty of care in failing to detect the check-kiting scheme. Bank of America conceded that David and Katherine Hubert were not individually liable for the breach of contract and that claim was dismissed. The trial court then entered judgment against Hubert P.C. for $63,853.46 along with attorney fees and costs. Hubert P.C. appealed.
The Court of Appeals reversed as to both the contract and negligence claims. The *413 court concluded that Key Bank was the payor bank, that Key Bank missed the midnight deadline, and that Bank of America was foreclosed from withdrawing provisional credit for the checks deposited in the IOLTA account. Bank of Am. NT & SA v. David W. Hubert, P.C., 115 Wash.App. 368, 380-81, 62 P.3d 904 (2003). The court rejected the fraud defense asserted by Bank of America, holding that Hubert was not a party to the check-kiting scheme. Id. at 381, 62 P.3d 904. As a result, the court held that Bank of America could not withdraw its provisional credit from the IOLTA account. Id. at 379-80, 62 P.3d 904.
As to the negligence claim, the Court of Appeals held that Hubert P.C. was not liable under the theory of respondeat superior.[6]Id. at 382-83, 62 P.3d 904. The court also held that Hubert P.C. was not negligent in supervising Williams because a legal professional corporation cannot be liable for the losses of third parties absent a showing of negligence by the lawyers. Because the negligence claim against David Hubert was dismissed, the court concluded that Hubert P.C. could not be liable. Id. at 383, 62 P.3d 904. Finally, the court ruled that the RPC could not provide a basis for a negligence claim by Bank of America. Id. at 384, 62 P.3d 904.
After its motion for reconsideration was denied, Bank of America filed a petition for review.

DISCUSSION
We review the summary judgment granted by the trial court de novo. The appellate court engages in the same inquiry as the trial court. Citizens for Responsible Wildlife Mgmnt. v. State, 149 Wash.2d 622, 630, 71 P.3d 644 (2003); Herron v. Tribune Publ'g Co., 108 Wash.2d 162, 169, 736 P.2d 249 (1987). A motion for summary judgment is properly granted where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c).

I. CONTRACT CLAIM
Under the contract between Bank of America and Hubert P.C., Hubert P.C. must cover any deficiency in its IOLTA account if Bank of America debits when Hubert P.C. does not have sufficient funds in its account. Hubert P.C. contends that in order for Bank of America to recover the deficit under the contract, Bank of America must have the right to withdraw provisional credit for the two checks that were deposited into the IOLTA account. Hubert P.C. argues, and the Court of Appeals held, that Bank of America did not have a right to withdraw provisional credit because the settlement became final on the checks when Key Bank, the payor bank, missed its midnight deadline for returning Williams' checks. RCW 62A.4-215.[7] Accordingly, Hubert P.C. argues that if Bank of America had credited the IOLTA account for the amount of the checks, $194,000, there would have been no deficit in the account.
Bank of America argues, however, that Sterling Savings Bank, rather than Key Bank, is the payor bank on the two checks, because Sterling Savings Bank purchased from Key Bank the account from which the checks were to be paid. If Sterling Savings Bank is the payor bank, the midnight deadline was met.[8]
*414 Under the Uniform Commercial Code (U.C.C.) a payor bank is the bank that is the drawee named on the draft. RCW 62A.4-105(3). A drawee is a person ordered in a draft to make payment. RCW 62A.4-104(8). A check is a draft. RCW 62A.4-104(7). The drawee on the checks here is Key Bank, not Sterling Savings Bank. Thus, the Court of Appeals held that Key Bank was the payor bank. Bank of Am., 115 Wash.App. at 380, 62 P.3d 904. The court stated that if a check is not ambiguous on its face, as in this case, the drawee named on the check is the payor bank. Id.
Bank of America concedes that the bank whose name appears on the check is normally the payor bank and should be held accountable for missing the midnight deadline. Indeed, the combination of RCW 62A.4-105(3), .4-104(8), and .4-302(a)(1) supports such a conclusion. However, Bank of America argues that the assumption underlying these articles is that the bank whose name appears on the check has the drawer's checking account and is in the best position to know the status of the account. 1 BARKLEY CLARK & BARBARA CLARK, THE LAW OF BANK DEPOSITS, COLLECTIONS AND CREDIT CARDS 6.01[3][d] at 6-6 (rev. ed.2003). Thus, if the bank designated as the payor bank does not have the drawer's checking account, the rationale for holding the bank accountable disappears even if its name is on the check. Accordingly, Bank of America argues that Sterling Savings Bank, the holder of Williams' account, is in the best position to check the status of her account and to be held accountable under the midnight deadline rule.
Hubert P.C. responds that a bank does not become a payor bank by being merely authorized to pay or by being given an instruction to pay not contained in the item, relying on the Official Comment to U.C.C. Article 4. U.C.C. § 4-105 cmt. 4.[9] However, what Key Bank did here is arguably more than an instruction or authorization: Key Bank sold its accounts to Sterling Savings Bank. Once the bank designated as the payor bank sells the drawer's checking account to another bank, the second bank, as the purchaser of the first bank, becomes the successor in interest as to the account. Thus, Bank of America contends Sterling Savings Bank assumed Key Bank's responsibility and became the payor bank.
Bank of America points to RCW 62A.1-102(1), which provides that the code "shall be liberally construed and applied to promote its underlying purposes and policies." The Bank urges that the code is intended to "modernize the law governing commercial transactions," and to allow for "the continued expansion of commercial practices through custom, usage and agreement of the parties." RCW 62A.1-102(2)(a), (b). And, the Bank argues, courts have noted that the code should be interpreted in consideration of the contemporary world of commercial business. E.g., SCADIF, S.A. v. First Union Nat'l Bank, 208 F.Supp.2d 1352, 1369-79 (S.D.Fla.2002), aff'd, 344 F.3d 1123 (11th Cir.2003). Although these points have appeal, Official Comment 2 to U.C.C. § 1-102 provides that the definitions contained in the U.C.C. cannot be varied by agreement of the parties. Thus, an agreement between Key Bank and Sterling Bank that Sterling Bank is responsible for paying on Key Bank's drafts cannot convert Sterling Bank into the payor bank in contravention of the U.C.C. definition of payor bank.
Bank of America also contends that the Court of Appeals holding does not carry out the purpose of Title 62A RCW and that we should look beyond the face of the instrument to determine who the payor bank is, citing Whitehall Packing Co. v. First National City Bank, 390 N.Y.S.2d 189, 55 A.D.2d 675 (1976).
Whitehall does not support the Bank's position. In that case, Whitehall Packing Company *415 sold meat to Trunz, Inc. Id. at 190. Along with invoices covering the shipment of meat to Trunz, Whitehall sent drafts to Trunz, which were "payable at" First National City Bank (FNCB). Id. at 191. When FNCB received the drafts, Trunz told FNCB to hold them without making payments. Id. at 190. Over 30 days later, they were returned unpaid to Whitehall at its request. Id. at 190. Whitehall sued FNCB, claiming that FNCB was liable because it was the payor bank which missed its midnight deadline. Id. The court held that it must look beyond the draft to determine who the payor was, stating that the items must fall due out of funds of the maker in its current account or which are otherwise available for payment. Id. at 191. Then, the court found that Trunz, rather than FNCB, was the payor given (1) that the portion of the draft which directed the payor to charge a certain amount was left blank, (2) that the invoice accompanied the drafts, and (3) that Whitehall asked FNCB to hold the invoice and bill of lading until it had collected the first draft from Trunz because Whitehall originally thought shipment was to be by rail rather than by truck. Id. at 191.
The factors considered in Whitehall are absent here: the checks at issue were not accompanied by any documents and had no blanks left. Further, the instrument at issue in Whitehall was not a check, as here, but rather an instrument "payable at" a bank. See former RCW 62A.3-121 (1992) (a note or acceptance which states it is payable at a bank is not of itself an order or authorization to the bank to pay it.) Additionally, neither Key Bank nor Sterling Savings Bank was asked to hold the check. Thus, Whitehall is factually distinguishable from this case.
Finally, Bank of America claims that Regulation CC § 229.40, which concerns bank mergers, should control situations where one bank has sold accounts to another bank. That regulation provides that when two or more banks have engaged in a merger transaction, they may be considered separate banks for a period of one year following consummation of the transaction. 12 C.F.R. § 229.40. As Bank of America notes, the sale of a checking account is similar to a merger in that the bank named on the check may not own a drawer's account. However, in a merger, unlike the sale of accounts between banks, the bank that owned the drawer's account is absorbed and a single bank remains. Further, it is not clear, even in the context of a merger, that the regulation changes the designation of a bank as the payor bank.
We agree with the Court of Appeals that Key Bank was the payor bank.
Next, Bank of America argues that even if Key Bank was the payor bank and it became accountable under the midnight deadline rule, Bank of America as the collecting bank is not accountable to Hubert P.C. because it did not receive a final settlement. Under RCW 62A.4-215(d), a collecting bank is accountable to its customer for the amount of the item if the collecting bank receives a settlement on the item that becomes final.
In support of its argument the Bank cites Mercantile Bank & Trust Co. v. Hunter, 31 Colo.App. 200, 501 P.2d 486 (1972). In that case, Hunter endorsed and deposited a check made payable to him in his checking account in a collecting bank. Id. at 201, 501 P.2d 486. The collecting bank credited Hunter's account and sent the check to the payor bank. Id. The payor bank failed to give the collecting bank a response before the midnight deadline. Id. at 201-02, 501 P.2d 486. Later, the check was returned to the collecting bank without being paid. Id. at 202, 501 P.2d 486. As Hunter refused to reimburse the collecting bank, it sued him. Id. The Colorado Court of Appeals first held that the payor bank is accountable for the amount of check if it retains the check after the midnight deadline.[10]Id. at 203-04, 501 P.2d 486. However, the court also held that the rule that a payor bank is accountable for an item does not mean that there has been a final settlement precluding a depositary bank from charging the amount of the check back from its depositor. Id. at 204, 501 P.2d 486.
The Hunter decision has since been repudiated in a factually identical case, Kimberly *416 A. Allen Trust v. FirstBank of Lakewood, N.A., 989 P.2d 203 (Colo.Ct.App.1999). In the Allen Trust case, the Colorado Court of Appeals held that a final settlement occurs when an item is deemed finally paid as a result of the payor bank's failure to revoke a provisional settlement. Id. at 206; see also Colo.Rev.Stat. §§ 4-4-215(a)(3), 4-4-302 (1998). Then, the court concluded that a settlement becomes final when the payor bank becomes accountable on a check by missing the midnight deadline. Id. The court observed that "the holding in Mercantile is inconsistent with the language and intent of § 4-4-215(d) and contrary to the generally recognized interpretation of the pertinent provisions of the Uniform Commercial Code." Allen Trust at 206.
The rule in Allen Trust fixes accountability of a collecting bank at the midnight deadline whereas the rule in Mercantile Bank & Trust Co. leaves uncertainty as to a collecting bank's accountability. In light of a need for efficiency, certainty, and finality in the national banking system, as well as the language of RCW 62A.4-302(a)(1), we hold that a settlement becomes final when the payor bank becomes accountable on a check and thus, a collecting bank is accountable to its customer where the payor bank retains a check beyond the midnight deadline.
Bank of America argues, however, that it was entitled to withdraw its provisional credit from Hubert P.C.'s IOLTA account based on Ms. William's fraud. Hubert P.C. contends that accountability under the midnight deadline is absolute.
We agree with Bank of America that a payor bank's accountability is subject to statutory and common law defenses. In its general provisions the U.C.C. provides that the principles of law and equity, including the law relative to fraud, misrepresentation, duress, coercion, mistake or other invalidating cause shall supplement its provisions. RCW 62A.1-103. Additionally, RCW 62A.4-302(2)(b) provides:
(b) The liability of a payor bank to pay an item pursuant to subsection (a) is subject to defenses based on breach of a presentment warranty (RCW 62A.4-208) or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank.
Case law also supports the Bank's position. In Bank Leumi Trust Co. of N.Y. v. Bally's Park Place, Inc., 528 F.Supp. 349 (S.D.N.Y.1981), the proprietor of a gambling casino deposited a check, knowing that the maker of the check had passed away and that his estate was insolvent. Id. at 351-52. The payor bank failed to return the check before the midnight deadline because of its negligence. Id. at 352-53. The court held that a bank could recover funds paid on a check by mistake where the maker had passed away prior to the presentment of the check. Id. at 354.
In American National Bank of Powell v. Foodbasket, 497 P.2d 546, 546-47 (Wyo.1972), an employee of Foodbasket, whose duty included checking invoices, making deposits and collecting insufficient fund checks, drew checks payable to Foodbasket on her personal account and endorsed them for the employer although she knew she had insufficient funds in her account. The checks were brought to the payor bank, which retained them beyond the midnight deadline. Id. at 547. However, the collecting bank cancelled the provisional credit for the amount of the checks given to Foodbasket. Id. Foodbasket sued the payor bank. After holding that an agent's knowledge is imputed to a principal with regard to the transaction as "an exception to an exception"[11] where the agent engaged in an independent fraudulent act on her own account is the sole representative of the principal, the court held that fraud is a valid defense to the accountability imposed by missing the midnight deadline. Id. at 548.
*417 In In re Spring Grove Livestock Exchange, Inc., 205 B.R. 149, 160-61 (Bankr.D.Minn.1997), another case where a payor bank retained a kited check beyond the midnight deadline, the court held that the payor bank could assert the fraud defense under U.C.C. § 4-302(b) as well as defenses under common law in order to avoid accountability under U.C.C. § 4-302(a).
Hubert P.C. argues, though, that American National Bank is distinguishable from this case because Title 62A RCW does not include language similar to the statute in American National Bank such as "in the absence of a valid defense." American Nat'l Bank, 497 P.2d at 547. However, as noted above, RCW 62A.4-302(2)(b) explicitly allows a defense based on fraud against the payor bank.[12] Hubert P.C. also attempts to distinguish American National Bank from this case by asserting that Washington does not recognize "an exception to an exception" rule in its agency law. However, Hubert P.C. is incorrect. Washington recognized this rule in Higgins v. Daniel, 5 Wash.2d 134, 105 P.2d 24 (1940). In that case, the court considered whether liability based on embezzlement by a director of a bank is imputed to the bank. Id. at 139-42, 105 P.2d 24. After recognizing the imputation principle and its exception where an agent acquires information which it would be to the agent's advantage to conceal from the principal, we pointed out that the knowledge of the agent is nevertheless imputed to the principal if the agent is the sole representative of the principal. Id. at 139, 105 P.2d 24. In that particular case, however, we concluded that the director who committed embezzlement was not the sole representative of the bank and held that the director's knowledge was not imputed to the bank. Id. at 141-42, 105 P.2d 24. This "exception to an exception" rule is recognized in other Washington cases. See, e.g., Heinrich v. Titus-Will Sales, Inc., 73 Wash.App. 147, 164-65, 868 P.2d 169 (1994) (the court acknowledged the principle but did not apply it because the parties did not raise the issue of whether the agent was the sole representative of the principal); Plywood Mktg. Assocs. v. Astoria Plywood Corp., 16 Wash.App. 566, 575, 558 P.2d 283 (1976) (the court applied the principle but held that the agent was not the sole representative of the principal).
In this case the Court of Appeals held that the fraud defense provided in RCW 62A.4-302(2)(b) was not available because nothing in the record suggested that Hubert was a party to the check-kiting scheme. Bank of Am., 115 Wash.App. at 381-82, 62 P.3d 904. The court also questioned whether a check-kiting scheme falls within the fraud defense in any case (citing 1 Clark & Clark at 9.01, at 9-3 (rev. ed.2001)). We disagree on both points.
According to Official Comment 3 to U.C.C. § 4-302, check-kiting falls within the fraud defense under RCW 62A.4-302(2)(b) where dishonest payees seek to use the midnight deadline to their benefit.[13] Here, Williams *418 was authorized to sign on the IOLTA account. She prepared all of Hubert P.C.'s real estate closings and David Hubert reviewed them. Thus, Williams was Hubert P.C.'s agent. Williams generated Hubert P.C.'s checks for its real estate closing transactions. Hubert P.C. allowed Williams to perform the accounting for the trust account. The stipulation to censure David Hubert strongly indicates that Williams was the sole person dealing with the IOLTA account. Additionally, the Customer Agreement between Hubert P.C. and Bank of America provided that a customer "shall be liable for any loss or damage to which your negligence contributed or which resulted from unauthorized, fraudulent, or dishonest acts by your current and/or former authorized representatives. Such liability includes instances when a current or former authorized representative effects one or more funds transfers to your detriment." Customer Agreement at 41. CP at 85.[14] Here, Williams executed three wire transfers from the IOLTA account totaling $171,710.61. The next day, she deposited two checks totaling $193,866.44 into the IOLTA account. The checks were payable to Hubert P.C.
Check-kiting involves at least two accounts at separate banks and a kiter covers overdrafts on one bank by writing overdrafts on the other bank by taking advantage of the several-day period for processing checks. 1 CLARK, supra, 9.01, at 9-1, 9-2. Thus, in determining whether the presentment of the checks is fraudulent, we must look at the whole check-kiting scheme rather than an individual presentment of checks in isolation. Looking at the whole scheme, the checks were presented and deposited in Bank of America in order to cover overdrafts created especially by wire transfers of September 15, 1998. The checks aim at covering up Williams' embezzlement from the IOLTA account. Thus, Williams' presentment of the checks was fraudulent. Accordingly, American National Bank and the customer agreement lead to a conclusion that Hubert P.C. committed fraud by imputation, excusing Key Bank from missing the midnight deadline under RCW 62A.4-302(2)(b).
Hubert P.C. argues, though, that American National Bank and Bank Leumi Trust Co. are irrelevant here because Hubert P.C. seeks payment from the collecting bank for its violation of RCW 62A.4-215(d) whereas the payee in American National Bank and Bank Leumi Trust Co. had a dispute with the payor bank based on U.C.C. § 4-302. However, where the payor bank is not held accountable because of the fraud defense under RCW 62A.4-302(2)(b), there is no final settlement precluding a depositary bank from charging the amount of the check back from its depositor under Allen Trust. Thus, Bank of America was free to withdraw the provisional credit from the IOLTA account.
The Court of Appeals reversed the summary judgment in favor of Bank of America and remanded for entry of judgment in favor of Hubert P.C.; therefore, it did not reach other arguments raised by Hubert P.C. We do so briefly.
Hubert P.C. raised an affirmative defense to the Bank's claim of contract breach under RCW 62.A4-401(b), which provides that a customer is not liable for an overdraft unless the customer signed the item or benefited from the proceeds of the item. Hubert P.C. contends that the IOLTA account had a positive balance prior to the last two withdrawals, which were made by Williams through wire transfers. Hubert P.C. argues that, since the funds were transferred to Williams' business account, by Williams, and Hubert P.C. had no signing authority on Williams' account, it cannot be liable. This argument overlooks the fact that Williams was authorized to sign on the IOLTA account and pursuant to the Customer Agreement was authorized to execute a wire transfer.
*419 Next, Hubert P.C. claims that the trial court erred when it refused to allow an amendment to its answer to add a counterclaim for wrongful wire transfer on the date for argument on summary judgment. The standard for review of a trial court's denial of a motion to amend pleadings is abuse of discretion. Del Guzzi Constr. Co. v. Global NW Ltd., 105 Wash.2d 878, 888, 719 P.2d 120 (1986). CR 15 provides a party may amend his pleading by leave of the court and leave shall be freely given when justice so requires. See Caruso v. Local Union No. 690 Int'l Bhd. of Teamsters, 100 Wash.2d 343, 349, 670 P.2d 240 (1983) (leave to amend should be freely given" `except where prejudice to the opposing party would result'") (quoting United States v. Hougham, 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960)). The court may consider such factors as delay, where delay causes unfair surprise. Id.
Here, the trial court denied the motion to amend based on the "late point" at which the amendment was offered. Verbatim Report of Proceedings at 24. Hubert P.C. contends that Bank of America would have suffered no prejudice from a late amendment since it was on notice of Hubert P.C.'s contention that the Bank wrongfully permitted the transfer.
We find no abuse of discretion. First, the motion to amend was made the day of the hearing on summary judgment motions from both parties. Second, the counterclaim lacks a factual basis. Hubert P.C. claims that Williams lacked authority to make wire transfers of funds in the IOLTA account. The evidence submitted on summary judgment is all to the contrary.[15] Hubert P.C. also claims that the Bank violated its agreement when it permitted the wire transfer because the agreement provides that there must be funds available at the time the transfer is initiated. But, in the materials submitted on summary judgment, the experts for both parties agree that this provision is designed to protect the Bank, not the customer.
Finally, Hubert P.C. claims that the trial court erred in entering judgment for attorney fees in an amount for which no documentation was provided. A trial court's award of fees and costs are reviewed for an abuse of discretion. Schmidt v. Cornerstone Invs., Inc., 115 Wash.2d 148, 169, 795 P.2d 1143 (1990). Here Bank of America submitted the declaration of Jed Morris in support of fees and costs. Hubert P.C. fails to demonstrate any abuse of discretion.

II. SUMMARY JUDGMENT ON NEGLIGENCE CLAIM
Bank of America argues that Hubert P.C. breached its duty of reasonable care under both common law and the Customer Agreement by failing to monitor and supervise the actions of Williams in the administration of the IOLTA account and in failing to properly maintain client funds in the IOLTA account pursuant to the RPC. The Court of Appeals held that Hubert P.C. could not be held liable for negligence because David Hubert, Williams' supervising attorney, was dismissed. In Washington, however, a principal is derivatively responsible for an agent's acts unless the agent's responsibility has been discharged on the merits and not based on a personal defense. Hansen v. Horn Rapids O.R.V. Park, 85 Wash.App. 424, 429 n. 2, 932 P.2d 724 (1997); Vern J. Oja & Assocs. v. Wash. Park Towers, Inc., 89 Wash.2d 72, 77, 569 P.2d 1141 (1977). Thus, a supervisor need not be a defendant individually in order for a principal to be responsible for negligent supervision of its employee, as long as a plaintiff proves that the supervision was indeed negligent. In this case, David Hubert, Hubert P.C.'s agent, was dismissed without prejudice rather than on the merits.[16] Thus, the Court of Appeals erred when it concluded that dismissal of a negligence claim is proper on the basis that the allegedly negligent supervisor has been dismissed.
However, we need not discuss the tort of negligence any further. We agree with Hubert P.C. that this case really involves *420 a contract claim that has been inappropriately analyzed as a tort. As Hubert P.C. contends, Bank of America alleged and pursued a breach of a contract claim against Hubert P.C.
Whether an action sounds in contract or tort is determined from the pleadings and complaint as a whole and the evidence relied upon, not by particular words and allegations, the form adopted by the pleadings, what the pleadings call it or the understanding of counsel or the trial court. Yeager v. Dunnavan, 26 Wash.2d 559, 562, 174 P.2d 755 (1946). Merely designating a cause of action as a tort is insufficient. See Gazija v. Nicholas Jerns Co., 86 Wash.2d 215, 217, 543 P.2d 338 (1975). An action sounds in contract when the act complained of is a breach of a specific term of the contract, without reference to the legal duties imposed by law on that relationship. Yeager v. Dunnavan, 26 Wash.2d 559, 562, 174 P.2d 755 (1946).
Here, the customer agreement between Bank of America and Hubert P.C. stipulates that Hubert P.C. would cover any deficiencies in the IOLTA account that resulted from debts due to insufficient funds. Hubert P.C. breached that agreement by failing to cover the approximate $64,000 deficit in the IOLTA account after reconciliation of the account. It is this breach of contract that gave rise to Bank of America's claim. Moreover, Bank of America has pursued this matter as a contract case.
Finally, although Bank of America argues that Hubert P.C. was negligent in failing to monitor the IOLTA account in violation of RPC 1.14, such a violation is an ethical violation and not a does not create a civil cause of action. Hizey v. Carpenter, 119 Wash.2d 251, 830 P.2d 646 (1992) (breach of an ethics rule provides only a public, e.g., disciplinary, remedy and not a private remedy). Accordingly, summary judgment of dismissal was properly granted as to any tort claim brought by Bank of America against Hubert P.C. for negligence.

CONCLUSION
We hold that Key Bank is the payor bank. We also hold that Bank of America is entitled to withdraw the provisional credit from the IOLTA account based on the agreement between Bank of America and Hubert P.C. and on the fraud defense under RCW 62A.4-302(2)(b). Further we affirm dismissal of Bank of American's claims against Hubert P.C. for negligence. Finally, we reverse the Court of Appeals and reinstate the trial court's summary judgment on the Bank's contract claim.
NOTES
[1] The Court of Appeals noted in its timeline that the checks were returned to Bank of America (then Seafirst) on September 22. However, that is the date the checks were received by the bank.
[2] David Hubert stipulated to discipline for violating RPC 5.3 and 1.14 by failing to supervise Ms. Williams' activities regarding his IOLTA account.
[3] RCW 62A.4-302(a)(1) provides:

(a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:
(1) A demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.
RCW 62A.4-302(a)(1). The midnight deadline is midnight on its next banking day following the banking day on which the bank receives the relevant item or notice or from which the time for taking action commences to run, whichever is later. RCW 62A.4-104(10).
[4] The trial court denied the defendants' motion to amend their answer to add the notice of dishonor and wrongful wire transfer claims. Nevertheless, the trial court also dismissed these claims in his ruling on summary judgment. CP at 391-92.
[5] To facilitate review Bank of America voluntarily dismissed the negligence claims against Hubert individually without prejudice. CP at 330.
[6] Although neither party raised this issue at the trial court, Bank of America urged the Court of Appeals to consider the issue pursuant to RAP 9.11.
[7] RCW 62A.4-215 provides:

(a) An item is finally paid by a payor bank when the bank has first done any of the following:
....
(2) Settled for the item without having right to revoke the settlement under statute, clearing-house rules, or agreement; or
(3) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule, or agreement.
....
(d) If a collecting bank receives a settlement for an item which is or becomes final, the bank is accountable to its customer for the amount of the item and any provisional credit given for the item in an account with its customer becomes final.
[8] The checks arrived at Key Bank on September 17, 1998, and at Sterling Savings Bank's check processing agent the next day. The checks were returned on September 19, 1998.
[9] "A bank does not become a payor bank by being merely authorized to pay or by being given an instruction to pay not contained in the item." U.C.C. § 4-105 cmt. 4. Courts in Washington have relied on the Official Comments to U.C.C. See, e.g., Jones v. Allstate Ins. Co., 146 Wash.2d 291, 313, 45 P.3d 1068, recons. denied, (Nov. 5, 2002) (U.C.C. § 3-111 cmt. 4); Fed. Signal Corp. v. Safety Factors, Inc., 125 Wash.2d 413, 424, 886 P.2d 172 (1994) (U.C.C. § 2-313 cmt. 1); Condon Bros., Inc. v. Simpson Timber Co., 92 Wash.App. 275, 283, 966 P.2d 355 (1998) (U.C.C. § 2-107 cmt. 1).
[10] The court relied on former U.C.C. § 4-302. However, this rule remains identical under current U.C.C. § 4-302, adopted by Washington in RCW 62A.4-302.
[11] In the law of agency, an agent's knowledge is imputed to a principal. As an exception to the rule, the knowledge of an agent engaged in an independent fraudulent act on her own account is not imputed to a principal. In this case, however, an agent's knowledge is imputed although the agent is engaged in an independent fraudulent act on her own account. This is why the rule is called "an exception to an exception." American Nat'l Bank, 497 P.2d at 548.
[12] RCW 62A.4-302(2)(b) provides:

(b) The liability of a payor bank to pay an item pursuant to subsection (a) is subject to defenses based on breach of a presentment warranty (RCW 62A.4-208) or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank. RCW 62A.4-302(2)(b).
[13] The Official Comment 3 to U.C.C. § 4-302 states:

3. Subsection (b) is an elaboration of the deleted introductory language of former Section 4-302: "In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of Section 4-207), settlement effected or the like...." A payor bank can defend an action against it based on accountability by showing that the item contained a forged indorsement or a fraudulent alteration. Subsection (b) drops the ambiguous "or the like" language and provides that the payor bank may also raise the defense of fraud. Decisions that hold an accountable bank's liability to be "absolute" are rejected. A payor bank that makes a late return of an item should not be liable to a defrauder operating a check kiting scheme. In Bank of Leumi Trust Co. v. Bally's Park Place Inc., 528 F.Supp. 349 (S.D.N.Y.1981), and American National Bank v. Foodbasket, 497 P.2d 546 (Wyo.1972), banks that were accountable under Section 4-302 for missing their midnight deadline were successful in defending against parties who initiated collection knowing that the check would not be paid. The "settlement effected" language is deleted as unnecessary. If a payor bank is accountable for an item it is liable to pay it. If it has made final payment for an item, it is no longer accountable for the item.
U.C.C. § 4-302 cmt. 3.
[14] RCW 62A.4-103(a) states:

(a) The effect of the provisions of this Article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.
[15] Hubert P.C. also raised wrongful wire transfer as an affirmative defense to Bank of America's contract claim.
[16] Neither party argued that Katharine Hubert was also in charge of supervising Williams.