[No. 26947-7-III.   Division Three.   December 2, 2008.]

MARCIA GRAHAM, *Appellant*, v. JAMES NOTTI, *Respondent.*

*George A. Critchlow* (of *University Legal Assistance*), for appellant.

*Karen G. Schweigert*, for respondent.

*Adam P. Karp* on behalf of Animal Law Offices, amicus curiae.

¶1 SWEENEY, J. — This is the saga of Harlee, the lost Pomeranian. His story raises questions about the nature of the property interest he represents and the political authority of animal protection agencies to sell or dispose of lost animals and, necessarily, the quality of the title to those animals these agencies can convey. There is evidence that Harlee was found in Spokane County but delivered, by the finder, to the city of Spokane animal shelter. The city shelter then adopted the dog out to the defendant. The defendant, despite the entreaties of the plaintiff, refused to relinquish possession of the dog. We conclude that the authority of the agency, here SpokAnimal C.A.R.E., turns on whether Harlee was found in the city of Spokane or in Spokane County. Accordingly, we reverse and remand for trial.

## FACTS

¶2 Marcia Graham and her family acquired a black Pomeranian puppy in December 2005; the family named

the dog "Harlee." Ms. Graham inadvertently let Harlee out of the family's Spokane County home, and the dog wandered away from the property on the night of July 17, 2007. The next day, Ms. Graham contacted both Spokane County Regional Animal Protection Services (SCRAPS), the Spokane County animal shelter, and SpokAnimal, the city of Spokane animal shelter. Ms. Graham also posted a lost dog notice on SpokAnimal's Web page. Meanwhile, another Spokane County resident, Jolee Wilke, noticed Harlee wandering around her neighbor's property during approximately the last week of July. After the dog came onto her property, Ms. Wilke brought the dog to SpokAnimal on July 29. Ms. Wilke asserts that she told SpokAnimal that she found the dog on her property in Spokane County. She also asserts that a SpokAnimal staff member informed her that the shelter did not normally impound dogs from the county and that they would contact SCRAPS to determine whether someone had reported a lost black Pomeranian to that shelter.

¶3 Hope Merkison is a SpokAnimal staff member. She conducted Harlee's intake. She says that Ms. Wilke informed her that Ms. Wilke had found Harlee wandering on the Spokane city side of 44th Avenue, the street off of which Ms. Wilke lived and the border between Spokane County and the city of Spokane. A dog found in Spokane County would normally be transferred to SCRAPS.

¶4 James Notti wanted to adopt the dog on the same day SpokAnimal accepted Harlee. SpokAnimal waited the requisite 72 hours and then adopted Harlee out to Mr. Notti on August 1, 2007.

¶5 On September 3, Ms. Graham learned that Ms. Wilke had delivered a dog who was likely Harlee to SpokAnimal. On September 4, the Grahams called and visited SpokAnimal to determine Harlee's status. Ms. Graham's husband saw information on the shelter's computer screen that partially identified Mr. Notti. SpokAnimal contacted Mr. Notti on September 4 to inform him that the original owners wished to retrieve the dog. SpokAnimal informed

the Grahams on September 8 that the adoptive owner was not willing to sell or otherwise return the dog. That same day, the Grahams went to Mr. Notti's home to request that he return Harlee. He refused.

¶6 Ms. Graham sent a letter to Mr. Notti on September 21 explaining her family's attachment to the dog and asking for the dog's return. Ms. Graham sent another letter on September 27, this time through counsel, offering to compensate Mr. Notti. Mr. Notti did not respond and Ms. Graham sued for replevin. The trial court dismissed the suit on Mr. Notti's motion for summary judgment.

## DISCUSSION

¶7 Ms. Graham contends that Mr. Notti did not obtain valid title to Harlee when he acquired the dog from SpokAnimal. She argues that the animal shelter is a private corporation and its authority is limited to the police power of the governmental entity with which it contracts. She argues therefore that the shelter could not pass good title to Mr. Notti by operation of law because SpokAnimal acted ultra vires when it sold a dog found in Spokane County. Essentially, she argues that the city's power to regulate is limited by its geographical boundaries and the state's general laws. WASH. CONST. art. XI, § 11; Clerk's Papers (CP) at 44-53 (SpokAnimal's contract with the city of Spokane); RCW 16.52.015, .020. She also argues that SpokAnimal did not obtain voidable title to Harlee under Washington's version of the Uniform Commercial Code because the Grahams did not transfer Harlee in a transaction for purchase or entrust Harlee to SpokAnimal. Ms. Graham also contends that Mr. Notti does not qualify for common law protections afforded to bona fide purchasers.

¶8 Mr. Notti responds that SpokAnimal had at least voidable title to Harlee and therefore conveyed good title to him. He argues that the owner of an unlicensed, lost pet need not voluntarily relinquish or transfer the pet before an animal shelter can transfer good title to a dog held for 72

hours. And he argues that an animal shelter's possessory interest in a pet trumps a private citizen's ownership interest. *See State v. Pollnow*, 69 Wn. App. 160, 165, 848 P.2d 1265 (1993).

¶9 Mr. Notti notes that Washington's view of the property interest in dogs is imperfect or qualified rather than absolute. *Am. Dog Owners Ass'n v. City of Yakima*, 113 Wn.2d 213, 217, 777 P.2d 1046 (1989). He argues that given the limited property interest in dogs, an animal shelter need not pay value or otherwise obtain the voluntary relinquishment from the original owner in order to secure good or voidable title. And he argues that SpokAnimal at least had voidable title because SpokAnimal did not exercise any authority outside the physical boundaries of Spokane city limits. *See, e.g., id.* at 217-18; *Sentell v. New Orleans & Carrollton R.R.*, 166 U.S. 698, 701, 17 S. Ct. 693, 41 L. Ed. 1169 (1897). He submits that a person may transfer good title to a good faith purchaser for value even with only voidable title. RCW 62A.2-403(1). Mr. Notti also argues that public policy requires a qualified property interest in dogs because of their propensity to stray and the compelling public interest in rotating stray animals off the streets into animal shelters and out of animal shelters into new homes.

¶10 We review a trial court's summary judgment order de novo; we engage in the same review as the trial court and view the evidence in the light most favorable to the nonmoving party. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990).

¶11 The terms "replevin" and "claim and delivery" are both terms that refer to the "underlying action for possession (or value) and damages for detention, as well as for [Washington's] summary seizure procedure." 1A KELLY KUNSCH, WASHINGTON PRACTICE: METHODS OF PRACTICE § 52.1 (4th ed. 1997). The plaintiff bringing a replevin action must show

(a) That the plaintiff is the owner of the property or is lawfully entitled to the possession of the property by virtue of a special property interest . . . ;

(b) That the property is wrongfully detained by defendant;

(c) That the property has not been taken for a tax, assessment, or fine pursuant to a statute and has not been seized under an execution or attachment against the property of the plaintiff, or if so seized, that it is by law exempt from such seizure; and

(d) The approximate value of the property.

RCW 7.64.020(2).

¶12 The plaintiff seeking replevin must be able to prevail on the strength of her title or right, regardless of the defendant's title or right to possession. *Crystal Recreation, Inc. v. Seattle Ass'n of Credit Men*, 34 Wn.2d 553, 558, 209 P.2d 358 (1949). Ms. Graham contends that SpokAnimal improperly transferred ownership of the dog to Mr. Notti by acting outside the scope of the authority granted by the city of Spokane.

¶13 Lost dogs present a challenge to courts trying to determine what law governs ownership disputes between an original owner and an adoptive owner. Case law is scarce. And it is therefore difficult to know what law applies—common law theories of personal property ownership, lost article statutes, or animal-specific legislation. *See* Eric W. Neilsen, Comment, *Is the Law of Acquisition of Property by Find Going to the Dogs?*, 15 T.M. COOLEY L. REV. 479 (1998).

¶14 Two points of law, however, do emerge from the modern treatment of companion animal ownership. First, owners have property rights in their companion animals, including dogs. *See* Susan J. Hankin, *Not a Living Room Sofa: Changing the Legal Status of Companion Animals*, 4 RUTGERS J.L. & PUB. POL'Y 314 (2007); *see also* Debra Squires-Lee, Note, *In Defense of Floyd: Appropriately Valuing Companion Animals in Tort*, 70 N.Y.U. L. REV. 1059, 1060 (1995) (noting that companion animals are legally

defined as "personal property"). And, second, those property rights in dogs are subject to the legitimate exercise of state police power. *Am. Dog Owners*, 113 Wn.2d at 217; *Rabon v. City of Seattle*, 107 Wn. App. 734, 743-44, 34 P.3d 821 (2001); *Ramm v. City of Seattle*, 66 Wn. App. 15, 20, 830 P.2d 395 (1992).

¶15 Mr. Notti supports his contention that dog owners have only a qualified property interest in their companion animals with cases that are relevant but not dispositive. *Sentell* held that the pet owner's property interest in his or her pet was qualified. *Sentell*, 166 U.S. at 701. The state could destroy an animal that posed a threat or offered no value to society. *Id.* at 704. And *American Dog Owners*, citing *Sentell* with approval, held that a city could exercise its police power to ban a particular breed of dogs that posed a threat to public safety. *Am. Dog Owners*, 113 Wn.2d at 217.

¶16 The parties here agree that the city of Spokane and Spokane County may exercise their police power in a way that impinges on a pet owner's property interest in his or her pet. So if SpokAnimal was acting within the scope of its delegated police powers, Ms. Graham's ownership of Harlee would have been properly extinguished when the shelter adhered to its procedures and adopted the dog out to Mr. Notti. Ms. Graham and Mr. Notti disagree, however, on whether SpokAnimal exceeded the scope of the police power it exercised on behalf of the city of Spokane when it accepted and adopted out Harlee, because he may have been found outside the city of Spokane territorial limits.

¶17 Harlee was physically transported into the city of Spokane and was present within city limits when the shelter accepted the animal. But it is anything but clear whether SpokAnimal's jurisdiction to act should be determined by the location where Harlee was found or by Harlee's location at the time he was admitted to SpokAnimal. The Spokane County Code (SCC) provisions for releasing animals for adoption (SCC 5.04.064) and impounding dogs (SCC 5.04.060) are silent on whether

where the animal was found is dispositive. However, SCC 5.04.060 does refer to SCRAPS as the organization having the authority to make decisions regarding an impounded animal. Likewise, the Spokane Municipal Code is silent as to what effect the location where the animal is found has on the city's or the city shelter's authority to dispose of the animal. It requires only that "[a]ny unlicensed dog is held for seventy-two hours from the time of impoundment." SPOKANE MUNICIPAL CODE 10.24.030(C)(1) ("Impoundment").

¶18 We conclude, however, that it does matter where Harlee was found for a couple of reasons. First, the contract between SpokAnimal and the city of Spokane provides that SpokAnimal shall "[f]urnish and maintain a shelter for the handling of all animals from the City, whether they are stray, impounded, or otherwise turned over to SpokAnimal by City residents or City employees acting in their official capacity." CP at 45. The contract authorizes SpokAnimal to impound and dispose of dogs "from the City." And there is a dispute over whether Harlee is an animal "from the City" as that phrase is used in the contract. *Compare* CP at 41-42 *with* CP at 105, 124. And Jolee Wilke is clearly not a "City resident." CP at 41, 124. Although SpokAnimal's internal record indicates that the animal was found at an intersection that SpokAnimal staff later determined to be nonexistent, both the streets indicated on the intake form are located outside Spokane city limits and in Spokane County.

¶19 Second, the Washington statute governing disposition of lost property in the hands of a governmental entity, a closely analogous context to the animal shelter's possession of Harlee, provides:

> If the property is not returned to a person validly establishing ownership or right to possession of the property, the governmental entity shall forward the lost property within thirty days but not less than ten days after the time the governmental entity acquires the lost property to the chief law enforcement officer, or his or her designated representative, of the county in which the property was found, except that if the property is found within the borders of a city or town the property shall be

forwarded to the chief law enforcement officer of the city or town or his or her designated representative.

RCW 63.21.060 ("Duties of governmental entity acquiring lost property—Disposal of property").

¶20 Therefore, whether Harlee was found within or outside Spokane city limits is a question of fact. Ms. Wilke asserts that she found the dog in Spokane County. And two SpokAnimal employees assert that Ms. Wilke informed the intake staff that she found the dog on the Spokane city side of 44th Avenue. Whether that fact is material depends on whether Ms. Graham has a viable right to possession of Harlee if SpokAnimal were acting as a private party rather than a government entity. In other words, if SpokAnimal could not have transferred valid title to Mr. Notti by operation of law by acting beyond its authority, could ownership have passed from Ms. Graham to Mr. Notti by another means? If it could have passed to Mr. Notti by other means, the question of whether Harlee was found in the county or city is not material.

■ ¶21 Washington, like many other states, has a lost property statute. Ch. 63.21 RCW. It provides procedures that "reflect the goals of encouraging the reporting of finds by awarding finder's fees and of reuniting true owners with their property by mandating extensive publication and notice requirements." Jennifer S. Moorman, Comment, *Finders Weepers, Losers Weepers?:* Benjamin v. Linder Aviation, Inc., 82 Iowa L. Rev. 717, 726 (1997). Among other requirements and procedures, Washington's lost property or "finder" statute, chapter 63.21 RCW, provides a 60-day waiting period from the day the finder reports the found property to the appropriate governmental entity or from the resolution of a judicial or other official proceeding, whichever is later. RCW 63.21.030(1).

¶22 Ms. Graham urges us to apply Washington's lost property or "finder" statute, chapter 63.21 RCW, by analogy to this lost dog scenario because the statute does not specifically exempt animals from the personal property it

regulates. Ms. Graham acknowledges that this court cannot reasonably impose the 60-day waiting period on the disposition of found animals, but asserts that "the general operation and spirit of the statutory scheme reveal a sound approach to balancing the property rights of animal owners with society's need for efficient and humane animal control." Br. of Appellant at 17.

¶23 However, we cannot determine whether a material issue of fact exists to merit reversal of summary judgment by resorting to the "finder" statute. As Ms. Graham concedes, the statute's provisions are not directly applicable to the animal context. The statute serves at most to indicate this state's general preference for returning lost property to its original owner where reasonable.

¶24 Ms. Graham also argues that SpokAnimal did not obtain voidable title to Harlee under Washington's codification of the Uniform Commercial Code (UCC), Title 62A RCW, because the Grahams did not transfer Harlee in a transaction for purchase or entrust him to SpokAnimal. Ms. Graham further contends that Mr. Notti does not qualify for the common law protection afforded bona fide purchasers because Ms. Graham did not voluntarily relinquish ownership or possession of Harlee. Ms. Graham does not support her theories of ownership with cases that address a lost pet sold by an animal shelter to a good faith purchaser. But the authority to which she cites supports her contention that Mr. Notti did not secure ownership rights under UCC Article 2 or the common law.

¶25 Under Washington's version of the UCC, a good faith purchaser for value acquires good title from seller with "voidable title." *Heinrich v. Titus-Will Sales, Inc.*, 73 Wn. App. 147, 158, 868 P.2d 169 (1994). But Mr. Notti did not obtain voidable title by either of the two means provided by the UCC: a transaction of purchase or entrustment. A purchase transaction involves a voluntary transaction creating an interest in property. RCW 62A.1-201(32). And inadvertently losing a dog does not qualify. Nor did Ms. Graham entrust Harlee to either Ms. Wilke or SpokAnimal,

so Mr. Notti cannot invoke the entrustment doctrine, RCW 62A.2-403(2) and (3), as a source of good title. *See Heinrich,* 73 Wn. App. at 152-53.

¶26 Likewise, the common law bona fide purchaser doctrine is not available to Mr. Notti because the original owner must voluntarily relinquish possession and ownership of her property to the third party who later sells the property to the good faith purchaser. *Linn v. Reid,* 114 Wash. 609, 611, 196 P. 13 (1921). An original owner does not voluntarily relinquish possession by mere negligence. *See Stohr v. Randle,* 81 Wn.2d 881, 882-84, 505 P.2d 1281 (1973). Deciding a somewhat analogous legal issue, a Washington appellate court recently held that the bona fide purchaser doctrine cannot cure an ultra vires sale of state-owned land, reasoning that other equitable principles such as equitable estoppel are also unavailable when a state agency exceeds its delegated authority. *S. Tacoma Way, LLC v. State,* 146 Wn. App. 639, 653, 191 P.3d 938 (2008), *petition for review filed,* No. 82212-3 (Wash. Oct. 6, 2008).

¶27 Mr. Notti responds to Ms. Graham's ownership analyses with public policy arguments. But, compelling as they may be, we are not free to create public policy under the guise of interpreting a statute. That is a legislative matter. *Sayan v. United Servs. Auto. Ass'n,* 43 Wn. App. 148, 159, 716 P.2d 895 (1986).

¶28 We conclude then that the issue of whether the dog was found in the city of Spokane is an issue of material fact that precludes summary judgment.

¶29 Ms. Graham urges us to resolve the case on summary judgment in her favor if we agree with her legal analysis. She argues that this promotes justice and judicial economy. She characterizes Mr. Notti's showing as inadmissible speculation and hearsay of two SpokAnimal employees. We cannot make such a characterization. That determination is for the trier of fact.

¶30 We review a trial court's summary judgment order de novo; we engage in the same review as the trial court and

view the evidence in the light most favorable to the nonmoving party. *Marincovich*, 114 Wn.2d at 274. When so viewed, we find disputed issues of fact, as we have already concluded.

¶31 We reverse the summary dismissal and remand for trial.

SCHULTHEIS, C.J., and BROWN, J., concur.

Review denied at 166 Wn.2d 1006 (2009).